James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Antonio Vozzolo
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, NY 10017
(212) 983-9330

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GINNINE FRIED, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A. d/b/a CHASE.<br><br>Defendants. | Civil Action No.<br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Ginnine Fried ("Plaintiff"), by her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action against defendants JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A. d/b/a Chase (collectively "Chase" or "Defendants") arising out of Defendants'

deceptive and/or unconscionable business practices in connection with the collection and assessment of Private Mortgage Insurance ("PMI") on residential mortgage transactions or loans which have been modified. Specifically, Chase misrepresents to borrowers the amount of time it can continue charge PMI on modified mortgage loans. Moreover, borrowers deceived by Chase are compelled to pay for unnecessary home valuations such as appraisals or broker price opinions ("BPOs") if they wish to stop paying PMI to Chase sooner.

2.      PMI is extra insurance that lenders require from most homebuyers who obtain loans that are more than 80 percent of their new home's value. In other words, buyers with less than a 20 percent down payment are normally required to pay PMI. PMI protects the mortgage lender in the event the mortgage borrower defaults. In order to combat abuses in cancelling and terminating PMI, the Homeowners Protection Act of 1998, 12 U.S.C. § 4901, *et seq.* ("HPA") was passed, which establishes that PMI must be automatically terminated by the servicer on the date when the principal balance of the loan is first scheduled to reach 78 percent of the "Original Value" of the property securing the loan (the "Termination Date"). Furthermore, the HPA defines Original Value as "the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage was consummated." 12 U.S.C. § 4901(12).

3.      In imposing PMI on class members who utilize Chase for their residential mortgage transactions and subsequent loan modifications, Chase purports to be in compliance with the HPA when recalculating the PMI Termination Dates of borrowers with modified loans.

4.      Through an elaborate scheme, however, Chase improperly utilizes BPOs or other assessments of the home's value, performed at the time of the loan modification, in place of the Original Value when calculating the Termination Date. Because Chase is using a lower assessment of home value instead of the Original Value as required under the HPA, Chase can

artificially extend the Termination Dates ("Misrepresented Termination Date"), causing borrowers to suffer damages, in the form of increased total PMI payments, longer loan payoff times, slower rate of building equity, increased interest, higher principal balances, and increased tax liabilities.

5.     Plaintiff seeks relief in this action individually, and as a class action on behalf of all persons in the United States who have mortgage loans with Chase subject to PMI, which have been modified by agreement, and for whom Chase recalculated PMI Termination Dates using any value other than the Original Value, resulting in an extension in the amount of time Chase can collect PMI, for violation of the HPA, breach of contract, breach of implied covenant of fair dealing, unjust enrichment, negligent misrepresentation, violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.,* and violation of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. § 56:12-14 to 56:12-18, *et seq.*

## THE PARTIES

6.     Plaintiff Ginnine Fried is a citizen of New Jersey, residing in Teaneck, New Jersey.  Plaintiff Fried entered into a mortgage agreement with Chase f/k/a Chase Home Finance, LLC, on or about April 25, 2007, which was subject to PMI.  On or about January 10, 2011 Plaintiff Fried entered into a Home Affordable Modification Agreement with Chase.  The terms of the modification adjusted, among other things, the principal balance on the loan, the interest rate, and the amount of each payment is applied towards principal and interest.  Plaintiff's monthly PMI payment is approximately $252.83.   Under the terms and conditions of the modification, and the amortization schedule resulting therefrom, the principal balance of Plaintiff Fried's loan was scheduled to reach 78% of the Original Value by July 2014.

7.     Defendant JPMorgan Chase & Co. maintains its corporate headquarters at 270 Park Avenue, New York, New York 10017.   JPMorgan Chase & Co. provides investment

banking, financial services for consumers and businesses, financial transaction processing, asset and wealth management and private equity services.  Defendant JPMorgan Chase & Co., also provides credit cards to consumers under the Chase brand.

8.      Defendant JPMorgan Chase Bank, N.A. d/b/a Chase is a wholly owned subsidiary of JPMorgan Chase & Co., successor by merger to Chase Home Finance, Inc. and Chase Home Finance, LLC, and handles the U.S. consumer and commercial banking businesses including home lending.  JPMorgan Chase Bank, N.A. d/b/a Chase maintains corporate offices at 3415 Vision Drive, Columbus, Ohio 43219.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from Defendants.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants do business throughout this district, and a substantial part of the events giving rise to Plaintiff Fried's claims took place within this judicial district.

## FACTS COMMON TO ALL CLAIMS

### Private Mortgage Insurance ("PMI")

12.     In order to lessen the risk of default, lenders typically prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%)

being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

13.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  PMI allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the provider of PMI—to protect the lender in the event of a default by the borrower.  *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.

14.     Generally, PMI refers to mortgage insurance other than mortgage insurance made available under the National Housing Act, title 38 of the United States Code (38 U.S.C. §§ 101 *et seq*.), or title V of the Housing Act of 1949 (42 U.S.C. §§ 1471 *et seq*.).

15.     Providers of PMI are typically unaffiliated third-party companies who agree to cover the first twenty percent (20%) to thirty percent (30%) of the amount of the potential claim for PMI coverage, including unpaid principal, interest and certain expenses.

16.     The amount of PMI coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required.

17.     While the lender is the beneficiary of the PMI, the borrower pays for the insurance, either (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

18.     Borrowers generally have no opportunity to comparison-shop for PMI, as the PMI is arranged by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the provider of PMI, rather than negotiated between

the    borrower    and    the    provider    of    PMI.    *See, e.g.,* http://www.privatemi.com/toolsresources/faqs.cfm.

### Cancelation and Termination of PMI Under the HPA

19.    The HPA governs when private mortgage insurance must be terminated or cancelled (or, if applicable, when private mortgage insurance may be terminated under a "protected state law" that allows earlier termination or termination when a higher principal balance is achieved).  *See* 12 U.S.C. §§ 4902, 4908.

20.    The HPA is largely a disclosure statute mandating disclosure to inform borrowers when PMI can be cancelled and when it must be automatically terminated.

21.    The HPA defines "Original Value" as the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage was consummated. 12 U.S.C. § 4901(12).

22.    In general, the HPA requires termination of PMI on the date when the principal balance of the loan is first scheduled to reach 78 percent of the Original Value of the property securing the loan (the "Termination Date"), provided that the mortgagor is current on the payments required under the mortgage. 12 U.S.C. §§ 4901(18), 4902(b).  If the PMI is not sooner cancelled or terminated, it must not be permitted to continue beyond the first day of the month immediately following the date that is the "midpoint of the amortization period" of the loan (*i.e.*, the point in time that is halfway through the period that begins on the first day of the amortization period established when the loan is consummated and ending upon the completion of the entire period when the mortgage is scheduled to be amortized).

23.    The HPA also provides that a mortgagor may request cancellation of PMI on, or at any time after, the date when the principal balance on the mortgage declines to 80% of the Original Value of the property (the "Cancellation Date").  12 U.S.C. §§ 4901(2), 4902(a).

27.     If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, Termination Date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.  12 U.S.C. § 4902(d).  Because a loan modification does not consummate the subject residential mortgage, it does not create a new Original Value.

28.     The Termination Date of a PMI requirement is based solely on the amortization schedule for the mortgage, irrespective of the actual outstanding balance on that date, and the Original Value.  For fixed rate mortgages, the Termination Date is calculated using the initial amortization schedule.  For adjustable rate mortgages, the Termination Date is calculated using the amortization schedule then in effect.  Under the HPA, "initial amortization schedule" means a schedule established at the time at which a residential mortgage transaction is consummated with respect to a fixed rate mortgage, showing (A) the amount of principal and interest that is due at regular intervals to retire the principal balance and accrued interest over the amortization period of the loan, and (B) the unpaid principal balance of the loan after each scheduled payment is made.  "Amortization schedule then in effect" means, with respect to an adjustable rate mortgage, a schedule established at the time at which the residential mortgage transaction is consummated, or if such schedule has been changed or recalculated, is the most recent schedule under the terms of the note or mortgage, which shows (A) the amount of principal and interest that is due at regular intervals to retire the principal balance and accrued interest over the remaining amortization period of the loan, and (B) the unpaid balance of the loan after each such scheduled payment is made.  12 U.S.C. § 4901.

29.     The ratio used to calculate Termination Dates under the HPA is distinct from the Loan to Value Ratio ("LTV") commonly used in real estate transactions for various purposes.  To calculate the LTV ratio, a servicer must divide the outstanding balance on the mortgage by

the current appraised value of the property, as opposed to the Original Value used in calculating Termination Dates.  With respect to the HPA, LTV ratios can be used as a condition to canceling PMI when requested by a borrower whose principal balance has reached less than 80% of the Original Value.  However, the LTV does not affect the Termination Date because the actual principal balance does not matter; only the amortization schedule and Original Value are relevant for calculating the Termination Date.

**Mortgage Modifications**

30.     Mortgage modifications, including those made under Home Affordable Modification Program ("HAMP"),[1] involve changes in the terms and conditions of a loan agreement to the benefit of the borrower.  Modifications can include, but are not limited to, reduction or changes in interest rates, changes in principal balance, changes in length of the loan term, and changes in monthly payment amounts.  Loan modifications that change the amount of principal and interest that is due at regular intervals to retire the principal balance and accrued interest over the amortization period of the loan create a new amortization schedule.

31.     Falling home values resulting from this nation's housing crisis are among the reasons borrowers seek to modify their mortgage loans.  Loan modifications are typically done to benefit borrowers by making payments more affordable.

32.     Loan modifications are distinct from refinancing.  Refinancing typically refers to the replacement of an existing loan with a new loan carrying different terms and conditions.  The replacement loan is a new residential mortgage transaction which creates a new Original Value.

---

[1]     In February 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable ("MHA") program in an effort to stem the foreclosure crisis.  As a part of the MHA, the Home Affordable Modification Program ("HAMP") was created.  Under HAMP, mortgagors can apply to their loan servicer for a permanent loan modification to get a reduced monthly payment.  *See* http://www.makinghomeaffordable.gov/pages/default.aspx.

33.     Loan modifications, however, merely adjust the terms of an existing mortgage, are not new residential mortgage transactions and thus, do not create new Original Values. Indeed, the HPA specifically establishes that a transaction for refinancing generates a new Original Value.  12 U.S.C. § 4901(12)

34.     In other words, unlike a transaction for refinancing, under the HPA when a mortgage loan is modified the Termination Date is recalculated to reflect the date the new amortization schedule resulting from the modification shows the principal balance is scheduled to reach 78% of the Original Value.  12 U.S.C. § 4902(d).  However, Chase misrepresents to borrowers when the true recalculated Termination Date is.

### Chase's Unconscionable Commercial Practices Concerning Termination Dates for Modified Loans

35.     Through an elaborate scheme, Chase continuously and systematically misrepresents to borrowers with modified loans that it is calculating Termination Dates in compliance with the HPA.  Specifically, for borrowers with borrowers with modified loans, Chase purports to use the terms of modification agreements to calculate when the principal balance on a modified loan will reach 78% of the Original Value.

36.     Moreover, Chase provides borrowers with annual notices concerning PMI, as required by the HPA.  In the annual notices Chase sends to borrowers with PMI, Chase specifically misrepresents that "If you are current on your loan payments, PMI will terminate automatically on the earlier of (i) the date the principal balance of your loan is first *scheduled* to reach 78% (75% of original appraised value for properties that reside in New York) of the 'original value' of the property, or (ii) the date that is the midpoint of the amortization period of your loan (e.g., for a 30-year loan, after the 181st payment has been made)."  (Emphasis in original).

9

37.     However, Chase is not actually using the Original Value to recalculate the Termination Dates, but instead is using a lower home value assessed at the time of the modification to extend the amount of time Chase collects PMI beyond what is allowed under the HPA.

38.     When Chase processes a loan modification it also makes an assessment of a home's value at the time of the modification using a BPO.  A BPO is a less scientific form of property valuation compared to an appraisal.  A BPO is "an estimate prepared by a real estate broker, agent, or sales person that details the probable selling price of a particular piece of real estate property and provides a varying level of detail about the property's condition, market and neighborhood, and information on comparable sales, but does not include an automated valuation model…"  12 U.S.C. § 3355(b).  "In conjunction with the purchase of a consumer's principal dwelling, broker price opinions may not be used as the primary basis to determine the value of a piece of property for the purpose of a loan origination of a residential mortgage loan secured by such piece of property."  12 U.S.C. § 3355(a).

39.     Rather, than using the Original Value, Chase utilizes uses the lower home value determined using the BPO in place of the Original Value when calculating the Termination Date.

40.     Although Chase is entitled to use a BPO to determine whether value of the home had declined below the Original Value as a condition to early cancellation of PMI[2], nothing in the HPA permits Chase to use the BPO in place of the Original Value for the purposes of calculating termination and cancellation dates under the HPA.

---

[2]     Whether the servicer must grant such a request for cancellation depends on certain requirements the mortgagor must meet, including having a good payment history, being current on the payments, and satisfying any requirements of the servicer to provide evidence the value of the property has not declined below the Original Value.

41.     Because Chase is using a lower value instead of the Original Value, the day it represents as the Termination Date is substantially later than the actual Termination Date under the HPA.

42.     As a result of this unconscionable and deceptive conduct, Chase can continue to collect PMI well beyond the true Termination Date, causing borrowers to suffer damages, in the form of increased total PMI payments, longer loan payoff times, slower rate of building equity, increased interest, higher principal balances, and increased tax liabilities.

43.     Moreover, when borrowers contact Chase after their true Termination Date has passed, despite continuing to be charged PMI, Chase misrepresents that the Termination Date has not yet passed.  Chase then proceeds to inform borrowers that in order to remove PMI prior to the Misrepresented Termination Date, borrowers must make a request for cancellation, subject to a new assessment of the home value or BPO, paid for by the borrowers.  Chase can deny the request for cancelation if a home value is assessed to be lower than the Original Value.  In other words, Chase can deny a request to cancel PMI if the LTV is higher than 80% (but not after the Termination Date has passed).

**Chase's Breach of the Terms of the Modification Agreements**

44.     Chase has entered into a contract with Plaintiff, and similarly situated borrowers, which is defined by the terms of the mortgage loan agreements and the superseding terms of the loan modifications agreements.   By entering into mortgage loan agreements and loan modification agreements with Plaintiff and similarly situated borrowers, Chase is agreeing to be bound by the duties defined created by the terms of the mortgage loan agreements and the superseding terms of the loan modifications agreements.

45.     Chase is breaching the terms and conditions of the contract entered into with borrowers.  If, arguendo, Chase is actually calculating the date the modified amortization

schedule shows the principal balance will reach 78% of the Original Value, then it is a different amortization schedule than what results from the terms and conditions of the modification agreement.  In other words, if Chase is not replacing the Original Value with a lower value as detailed above, then the loan does not have the principal balance, interest rate, and/or amortization schedule set forth by the terms of the modification agreement.

46.     The terms of the modification agreement between the borrowers and Chase dictate the principal balance, interest rate, the amount of principal and interest that is due at regular intervals to retire the principal balance and accrued interest over the remaining amortization period of the loan, and the unpaid balance of the loan after each such scheduled payment is made.  The terms of the modification agreement define the amortization schedule. By not adhering to the amortization schedule defined by the terms and conditions of the modification agreement, Chase is breaching the contract entered into with its borrowers.

**Plaintiff's Experience**

47.     Plaintiff Fried entered into a mortgage loan agreement to secure the purchase of her home on or about April 25, 2007.  The mortgage loan was for $497,950.00 plus interest, at a yearly rate of 6.250%.  The sales price of the property was $553,330.00, and the appraisal value was $570,000.00, thus the Original Value is $553,330.00.   78% of the Original Value is $431,597.40, and 80% of the Original Value is $442,664.

48.     Payment of PMI was required on the mortgage loan.  As required by the HPA, Chase provided Plaintiff Fried with a PMI disclosure statement stating PMI was scheduled to automatically terminate on March 1, 2016, the date on which the principal balance of the mortgage loan, based solely on the initial amortization schedule, irrespective of the outstanding principal balance on that date, is first scheduled to reach 78% of the Original Value of the property.  This comports with the amortization schedule in the mortgage loan agreement.

49.     On or about January 10, 2011, Plaintiff Fried entered into a Home Affordable Modification Agreement with Chase.  According to the terms of the Modification Agreement, effective February 1, 2011, the new principal balance would be $463,736.98 (this is 83.8% of the Original Value).  Additionally, the Modification Agreement established the following payment schedule and interest rates, with a balloon payment of $190,147.30 due on the new maturity date of May 1, 2037:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins on | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-5 | 2.000% | 01/01/2011 | $1,518.80 | $1,593.23 May adjust periodically | $3,112.03 May adjust periodically | 02/01/2011 | 60 |
| 6 | 3.000% | 01/01/2016 | $1,736.21 | May adjust periodically | May adjust periodically | 02/01/2016 | 12 |
| 7 | 4.000% | 01/01/2017 | $1,963.34 | May adjust periodically | May adjust periodically | 02/01/2017 | 12 |
| 8-27 | 4.625% | 01/01/2018 | $2,108.77 | May adjust periodically | May adjust periodically | 02/01/2018 | 232 |

50.     A full amortization schedule based on the terms set forth in Section 3 of the Modification Agreement shows the principal balance was scheduled to reach $431,314.42 July 2014.

51.     The Modification Agreement neither changes nor mentions the Original Value of the loan.

52.     Plaintiff Fried contacted Chase to inquire about the cancelation and Termination Dates of the PMI on her loan.  In response to Plaintiff Fried's inquiry, Chase stated in a letter

dated August 31, 2012, "[t]he PMI is scheduled to automatically cancel on November 1, 2026, based on your original amortization schedule reaching a 78% loan to value (LTV) ratio."   The August 31, 2012 letter then went on to state that if Plaintiff Fried wished to cancel the PMI prior to November 1, 2026, her LTV ratio must be at or below 80% and must pay to have a BPO or appraisal performed to assess the value of the property.

53.     After Plaintiff Fried questioned the misrepresentations in the August 31, 2012 letter, Chase sent additional letters, dated October 10, 2012 and April 09, 2013 with further misrepresentations.  In the October 10, 2012 and April 9, 2013 letters, Chase states:

> "Due to the completed loan modification on your mortgage account, your PMI is scheduled to automatically cancel without a need for an inspection on November 1, 2026.  This date is when the loan will reach 78% based on the modified terms and conditions.  The cancellation of mortgage insurance will occur if your mortgage payments are current on the loan, and your loan has no outstanding late charge balance.
>
> A new [BPO] is required, which confirms that the value of your home has not declined below the value it had at origination of your loan.  A BPO is an interior and exterior inspection of your home and is not considered an appraisal. The BPO fee is non-refundable even if the BPO verifies that the PMI cannot be removed…"

54.     In response to further inquiries by Plaintiff Fried, Chase repeated in a letter dated October 4, 2013, the misrepresentation that the terms of the Modification Agreement adjusted the automatic cancellation date from March 1, 2016 to November 1, 2026, and disclosed Chase has utilized a value of $420,000.00 determined by a BPO ordered during its modification review. Indeed, the amortization schedule resulting from the modification agreement shows the principal balance on November 1, 2026 is scheduled to be less than $327,600.00 or 78% of the BPO value.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff seeks to represent a class defined as all persons in the United States who have mortgage loans with Chase subject to PMI, which have been modified by agreement, and

for whom Chase recalculated PMI Termination Dates using any value other than the Original Value, resulting in an extension in the amount of time Chase can collect PMI (hereafter, the "Class").

56.     Plaintiff also seeks to represent a subclass of all Class members who have mortgage loans with Chase subject to PMI, which have been modified by agreement, and for whom Chase recalculated PMI Termination Dates using any value other than the Original Value in the State of New Jersey (hereafter, the "New Jersey Subclass").

57.     Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but will be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the records of Defendants.

58.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

(a)     whether Chase misrepresents the PMI Termination Dates for modified mortgage loans;

(b)     whether Chase uses the Original Value when calculating the Termination Dates for modified mortgage loan;

(c)     whether Chase has breached the terms of the contract entered into with members of the class;

(d)     whether Chase has breach its implied covenant of good faith and fair dealing;

(e)      whether Chase has induced borrowers to pay for unnecessary BPOs or appraisals;

(f)      whether Chase intended that borrowers be misled;

(g)      whether Chase's Misrepresented Termination Dates were likely to deceive borrowers;

(h)      whether borrowers have suffered an ascertainable loss;

(i)      whether Chase has violated the Homeowners Protection Act;

(j)      whether Chase has violated the New Jersey Consumer Fraud Act; and

(k)      whether Chase has violated the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. §§ 56:12-14 to 56:12-18, *et seq.*

59.      Plaintiff's claims are typical of the claims of Class and Subclass members because Plaintiff and all Class members have entered into modification agreements with Chase.

60.      Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained counsel competent and experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

61.      The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### (Homeowners Protection Act of 1998, 12 U.S.C. § 4901, *et seq.*)

62. Plaintiff and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

63. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants pursuant to the HPA, 12 U.S.C. § 4901, *et seq.*, which applies to the residential mortgages and residential mortgage transactions at issue in this case.

64. Plaintiff and Class members are "mortgagors" as defined in 12 U.S.C. § 4901(11).

65. Defendants are "mortgagees" as defined in 12 U.S.C. § 4901(10) and "servicers" as defined in 12 U.S.C. § 4901(16).

66. The HPA defines "Original Value" as "the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated. In the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction." 12 U.S.C. § 4901(12).

67. Under the HPA, the term "Termination Date" means:

> (A) with respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

(B)     with respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

12 U.S.C. § 4901(18).

68.     A requirement for PMI in connection with a residential mortgage transaction shall terminate with respect to payments for that mortgage insurance made by the mortgagor:

(1)     on the termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction; or

(2)     if the mortgagor is not current on the termination date, on the first day of the first month beginning after the date that the mortgagor becomes current on the payments required by the terms of the residential mortgage transaction.

12 U.S.C. § 4902(b).

69.     If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms and conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, Termination Date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.  12 U.S.C. § 4902(d).

70.     Plaintiff and members of the Class agreed to a modification of the terms and conditions of their mortgage loans with Defendants.  Under the modified terms and conditions of such loans, the date on which the principal balance of the mortgages are first scheduled to reach 78 percent of the Original Value of the property securing the loan.

71.     Chase violated 12 U.S.C. § 4902(d) by not recalculating Plaintiff and Class members' Termination Dates to reflect the modified terms and conditions of their loans.

72.     Chase violated 12 U.S.C. § 4902(b) by requiring the payment of PMI past Plaintiff and Class members' true Termination Dates.

73.     As a result of Defendants conduct, Plaintiff and members of the Class incurred damages.   Plaintiff and members of the Class have been required to pay PMI past their Termination Dates.   Chase is liable to Plaintiff and members of the Class for actual and statutory damages, costs of the action, and reasonable attorney fees because of its violation of the HPA.

## COUNT II
### (Breach of Contract)

74.     Plaintiff repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

75.     Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against all Defendants under New Jersey Law.

76.     Defendants entered into mortgage and modification agreements with Plaintiff and members of the Class and Subclass.   The mortgage agreements and modification agreements are parts of the contract between Defendants and Plaintiff, and members of the Class and Subclass.

77.     The terms and conditions of the contract establish the Original Value as defined by the HPA.   The Original Value established by the contract is binding upon Defendants.

78.     The terms and conditions of the modification agreements establish the amortization schedule for Plaintiff and Class members' mortgage loans.   The amortization schedule established by the contract is binding upon Defendants.

79.     By disregarding the Original Value and amortization schedule established by the terms and conditions of the contract in calculating Termination Dates for the PMI requirements on Plaintiff and Class members' mortgage loans, Chase has breached the terms and conditions of the contract.

80.     As a result of Chase's breach of contract, Plaintiff and Class members are required to pay PMI longer than if the Termination Date was calculated in comport with the terms and conditions of the contract.

### COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

81.     Plaintiff repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

82.     Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against all Defendants under New Jersey Law.

83.     Under New Jersey common law, a covenant of good faith and fair dealing is implied into every contract.

84.     As a result of the conduct alleged herein, Chase is in breach of their implied covenant of good faith and fair dealing with respect to its contract with Plaintiff and the Class and with respect to the underlying the mortgage loan and modification agreements.

85.     Plaintiffs and the Class have been damaged by Chase's breach of the covenant of good faith and fair dealing because this breach caused and continue to cause Plaintiff and Class Members to be denied the benefits contemplated and provided for by the HPA.

### COUNT IV
### (Unjust Enrichment)

86.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

87.     Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against all Defendants.

88.     Plaintiff and Class members conferred a benefit on Defendants by paying PMI past the true Termination Date.

89.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' payment of PMI past the true Termination Date.  Retention under these circumstances is unjust and inequitable because Defendants claimed that the Misrepresented Termination Dates were properly calculated using the Original Value and amortization schedule established by the mortgage loan and modification agreements, when in fact they were not, which caused injuries to Plaintiff and Class members because (a) they would not have been required to pay PMI past the true Termination Date if Chase had used the Original Value and amortization schedule; and (b) the Termination Dates were not calculated using the Original Value and correct amortization schedule as represented.

90.     Because Defendants' retention of the non-gratuitous benefit conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class members for their unjust enrichment, as ordered by the Court.

## COUNT V
### (Negligent Misrepresentation)

91.     Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

92.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants.

93.     Defendants misrepresented Plaintiff and Class members' Termination Dates.

94.     Chase also misrepresented how it calculated the Termination Dates.

95.     These representations were material facts that influenced Plaintiff's and Class members' ability to not overpay PMI to Chase.

96.     Defendants made these representations with the intent to induce Plaintiff and Class members to act upon them by continuing to pay PMI to Chase until the Misrepresented Termination Date.

97.     At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

98.     Plaintiff and Class members justifiably and detrimentally relied on these representations and, as a proximate result thereof, have suffered damages in the form of lost money from paying PMI past the true Termination Date.

99.     Accordingly, and as a proximate result of Defendants' misrepresentations as set forth herein, Plaintiff and Class members lost the money they paid for PMI in an amount to be determined at trial in that it did not have the Termination Date Defendants represented to them that it had.  Had Plaintiff and the Class members known the true facts about the Termination Dates, they would not have overpaid PMI.

**COUNT VI**
**(Violation of the New Jersey Consumer Fraud Act "NJCFA,"**
**N.J.S.A. § 56:8-1, *et seq.*)**

100.     Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

101.     Plaintiff brings this claim on behalf of the Class and the New Jersey Subclass under New Jersey law.

102.     Defendants, by misrepresenting Termination Dates and the manner in which the Termination Dates were calculated, as set forth above, engaged in deceptive practices and acts in violation of the NJCFA.

103.    Defendants used unconscionable commercial practice, deception, fraud, false pretense, false promises, and misrepresentations in connection with the PMI requirements of mortgage loans with Chase subject to PMI, which have been modified by agreement.

104.    Chase claims that Misrepresented Termination Dates were properly calculated using the Original Value and amortization schedule established by the mortgage loan and modification agreements, when in fact they were not.

105.    Defendants engaged in an unconscionable commercial practice because Defendants knew the Misrepresented Termination Dates were not properly calculated using the Original Value and amortization schedule established by the mortgage loan and modification agreements, therefore Defendants' conduct demonstrates a lack of good faith, and disregard for honesty and fair dealing.

106.    Defendants, including the failure to properly calculate Termination Dates using the Original Value and amortization schedule established by the mortgage loan and modification agreements.  Defendants knew they did not use the Original Value and amortization schedule established by the mortgage loan and modification agreements to calculate the Termination Date which would result in requiring PMI payments past the true Termination Date.  Plaintiff and Class members suffered an ascertainable loss caused by because (a) they would not have been required to pay PMI past the true Termination Date if Chase had used the Original Value and amortization schedule; and (b) the Termination Dates were not calculated using the Original Value and correct amortization schedule as represented.

## <u>COUNT VII</u>
**(Violations of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act "TCCWNA," N.J. Stat. Ann. §§ 56:12-14 to 56:12-18)**

107.    Plaintiff repeats the allegations contained in the above paragraphs as if fully set forth herein.

108.   Plaintiff brings this Count VII individually and on behalf of the members of the Class and the New Jersey Subclass against Defendants.

109.   The TCCWNA provides:

No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign … which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.

N.J.S.A. § 56:12-15.

110.   The mortgage loan agreements and modification agreements Chase entered into with Plaintiff and members of the Class are written consumer contracts subject to the TCCWNA.

111.   Plaintiff and members of the Class and the New Jersey Subclass are "consumer[s]" within the meaning of N.J.S.A. § 56:12-15.

112.   Defendants are "lender[s]" within the meaning of N.J.S.A. § 56:12-15.

113.   The rights of consumers to truthful and accurate statements in the mortgage loan agreements and modification agreements Chase entered into with Plaintiff and members of the Class, as well as the right to avoid deception caused by false and misleading statements, are "clearly established legal rights" under N.J.S.A. § 56:12-15.

114.   The responsibility of a lender to refrain from the employment of any unconscionable commercial practice, deception, fraud, false pretense, or misrepresentation in connection with written consumer contracts are clearly established under N.J.S.A. § 56:8-2.

115.   Defendants violated the TCCWNA by misrepresenting that the Original Value and amortization schedule established by the mortgage loan and modification agreements are used by Chase to calculate the Misrepresented Termination Date, when in fact they did not.

116.     Defendants violated the TCCWNA by their misrepresentations concerning how Chase actually calculated the Termination Dates.

117.     Pursuant to N.J.S.A. § 56:12-17, Defendants are liable to Plaintiff and the New Jersey Subclass for civil penalties or for actual damages, or both, at the election of the consumer. In addition, Plaintiff is entitled to reimbursement for all reasonable attorneys' fees and court costs incurred as a result of bringing this action.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

      a.      For an order certifying the nationwide Class and the Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representatives of the Class and Subclasses and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass members;

      b.      For an order declaring the Defendants' conduct violates the statutes referenced herein;

      c.      For an order finding in favor of Plaintiff, the nationwide Class, and the Subclass on all counts asserted herein;

      d.      For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

      e.      For prejudgment interest on all amounts awarded;

      f.      For an order of restitution and all other forms of equitable monetary relief;

      g.      For injunctive relief as pleaded or as the Court may deem proper; and

      h.      For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

                    CARELLA, BYRNE, CECCHI
                    OLSTEIN, BRODY & AGNELLO
                    Attorneys for Plaintiff


                    By:_____/s/ James E. Cecchi_____
                        JAMES E. CECCHI

Dated: April 8, 2015

Antonio Vozzolo
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff


By:___/s/ James E. Cecchi_____
        JAMES E. CECCHI

Dated:  April 8, 2015

Antonio Vozzolo
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330