# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GINNINE FRIED, on behalf of herself and all others similarly situated,

　　　　　　　　　Plaintiff,

　　　v.

JPMORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A. d/b/a Chase,

　　　　　　　　　Defendants.

Case No.: 2:15-cv-02512-MCA-MAH
Hon. Madeline Cox Arleo

Motion Day:  July 20, 2015

ORAL ARGUMENT REQUESTED


# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

Robert D. Wick
Christian J. Pistilli
Kathryn Cahoy
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

Anthony Del Guercio
PARKER IBRAHIM & BERG LLC
270 Davidson Avenue
Somerset, NJ 08873
(908) 725-9700

*Attorneys for Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND AND SUMMARY OF THE ALLEGATIONS ................................. 3

    A.     The Homeowners Protection Act ................................................. 3

    B.     Fannie Mae and Freddie Mac ..................................................... 6

    C.     The Home Affordable Modification Program ............................ 7

    D.     Plaintiff's Mortgage Loan and HAMP Loan Modification ................... 9

    E.     Plaintiff's Allegations ................................................................ 10

STANDARD OF REVIEW ..................................................................................... 11

ARGUMENT ......................................................................................................... 12

I.     CHASE PROPERLY CALCULATED PLAINTIFF'S TERMINATION DATE. .......... 12

    A.     Principles of Statutory Construction .......................................... 13

    B.     The Plain Language of the HPA Required Chase To Use the Updated Value of Plaintiff's Property in Calculating Her PMI Termination Date. ............ 14

    C.     Plaintiff's Contrary Interpretation of the HPA Conflicts with Common Sense and the Statutory Purpose. ............................................. 16

    D.     Plaintiff's Experience Illustrates the Infirmity of Her Interpretation. ................... 19

II.    PLAINTIFF'S HPA CLAIM IS TIME-BARRED. ........................................... 20

III.   PLAINTIFF'S STATE-LAW CLAIMS ARE PREEMPTED. ........................... 21

IV.   PLAINTIFF FAILS PROPERLY TO ALLEGE THE ELEMENTS OF HER STATE-LAW CLAIMS ............................................................................ 24

    A.     Plaintiff's Breach of Contract and Implied Covenant Claims Fail as a Matter of Law. ........................................................................... 24

    B.     Plaintiff's Unjust Enrichment Claim Fails as a Matter Of Law. ........................... 26

    C.     Plaintiff's Negligent Misrepresentation Claim Fails as a Matter of Law. ........... 27

i

       D.       Plaintiff's TCCWNA Claim Fails as a Matter of Law. ........................................ 28

V.       PLAINTIFF FAILS TO STATE A CLAIM AGAINST JPMC. ...................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abramski v. United States*,
  134 S. Ct. 2259 (2014) ........................................................................13

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-MD-2481 KBF, 2015 WL 1344429 (S.D.N.Y. Mar. 23, 2015) ................................29

*Am. Tobacco Co. v. Patterson*,
  456 U.S. 63 (1982) ............................................................................13

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*,
  503 F.3d 256 (3d Cir. 2007) ..................................................................11

*Applied Image Reprographics, Inc. v. Citizens Bank of Mass.*,
  No. SUCV200505058A, 2012 WL 2913528 (Mass. Super. Ct. June 5, 2012) ......................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................11

*In re ATM Fee Antitrust Litig.*,
  768 F. Supp. 2d 984 (N.D. Cal. 2009) ........................................................29

*Augustson v. Bank of Am., N.A.*,
  864 F. Supp. 2d 422 (E.D.N.C. 2012) .........................................................23

*Barzelis v. Flagstar Bank, F.S.B.*,
  784 F.3d 971 (5th Cir. 2015) ................................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................11

*Billings v. TD Bank, NA*,
  No. 13-2969, 2013 WL 3989572 (D.N.J. Aug. 1, 2013) .........................................28

*Bruesewitz v. Wyeth Inc.*,
  561 F.3d 233 (3d Cir. 2009) ..................................................................13

*Budhun v. Reading Hosp. & Med. Ctr.*,
  765 F.3d 245 (3d Cir. 2014) ..................................................................30

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011) ..................................................................29

*Cargill Global Trading v. Applied Dev. Co.*,
706 F. Supp. 2d 563 (D.N.J. 2010) ....................................................................25, 26

*Dewey v. Volkswagen AG*,
558 F. Supp. 2d 505 (D.N.J. 2008) ............................................................................27

*Dobroshi v. Bank of Am., N.A.*,
65 A.D.3d 882 (N.Y. App. Div. 2009) .......................................................................26

*DSK Enters., Inc. v. United Jersey Bank*,
459 A.2d 1201 (N.J. Super. Ct. App. Div. 1983) .......................................................27

*FDA v. Brown & Williamson Tobacco*,
529 U.S. 120 (2000) ..............................................................................................13, 17

*Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*,
903 F. Supp. 2d 274 (S.D.N.Y. 2012) .........................................................................6

*Fellows v. CitiMortgage, Inc.*,
710 F. Supp. 2d 385 (S.D.N.Y. 2010) ..................................................................23, 24

*Gager v. Dell Fin. Servs., LLC*,
727 F.3d 265 (3d Cir. 2013) .......................................................................................11

*Gillespie v. HSBC N. Am. Holdings, Inc.*,
No. 05-cv-362, 2006 WL 2735135 (M.D. Fla. Sept. 25, 2006) .................................30

*Gregor v. Aurora Bank FSB*,
26 F. Supp. 3d 146, 154 (D.R.I. 2014) .......................................................................23

*Gul v. Attorney Gen. of U.S.*,
385 F. App'x 241 (3d Cir. 2010) ................................................................................22

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) ....................................................................................................22

*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010) ....................................................................................................21

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ....................................................................................................22

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ....................................................................................................13

*Nat'l Premium Budget Plan Corp. v. Nat'l Fire Ins. Co. of Hartford*,
234 A.2d 683 (N.J. Super. Ct. Law Div. 1967) .........................................................27

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)........................................................................11

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
998 F.2d 1192 (3d Cir. 1993)..............................................................11, 12

*In re Price*,
370 F.3d 362 (3d Cir. 2004)........................................................................13

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997)........................................................................13

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008)........................................................................22

*Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*,
783 F.3d 156 (3d Cir. 2015)........................................................................16

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983)........................................................................22

*Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*,
737 F.3d 879 (3d Cir. 2013)........................................................................24

*Slack v. Suburban Propane Partners, L.P.*,
No. 10-2548, 2010 WL 5392845 (D.N.J. Dec. 22, 2010)........................28

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
132 S. Ct. 1997 (2012)........................................................................14

*Town of Babylon v. Fed. Hous. Fin. Agency*,
699 F.3d 221 (2d Cir. 2012)................................................................7, 18

*United States v. Bestfoods*,
524 U.S. 51 (1998)........................................................................30

*United States v. State of N.J., Violent Crimes Comp. Bd.*,
831 F.2d 458 (3d Cir. 1987)........................................................................13

*VRG Corp. v. GKN Realty Corp.*,
641 A.2d 519 (N.J. 1994)........................................................................26

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*,
712 F.3d 165 (3d Cir. 2013)........................................................................26

*West v. Bank of Am., N.A.*,
No. 2:10-CV-1966, 2011 WL 2491295 (D. Nev. June 22, 2011) .............29

*Wilson v. Amerada Hess Corp.*,
   773 A.2d 1121 (N.J. 2001) ................................................................25

**Rules and Statutes**

12 U.S.C. § 4901 .........................................................................5, 16

12 U.S.C. § 4902 ................................................................... *passim*

12 U.S.C. § 4907 ...............................................................................20

12 U.S.C. § 4908 ...................................................................6, 21, 22

29 U.S.C. § 1144 ..............................................................................22

N.J. Stat. Ann. § 56:12-15 ...............................................................28

Pub. L. 106-569, § 402(c)(1)(B), 114 Stat. 2944, 2956 ...................5

**Other Authorities**

143 Cong. Rec. 25,694 (1997) ...........................................................4

143 Cong. Rec. 5660 (1997) ..............................................................4

143 Cong. Rec. 5661 (1997) ..............................................................4

143 Cong. Rec. 5666 (1997) ..............................................................4

144 Cong. Rec. 15,267 (1998) ...........................................................4

144 Cong. Rec. 15,269 (1998) ...........................................................4

146 Cong. Rec. 8908 (2000) ..............................................................5

Chase Mortg. Fin. Corp. & The Bank of N.Y. Trust Co., N.A. Multi-Class
   Mortgage Pass-Through Certificates/Series 2007-S5, Pooling & Servicing
   Agreement (Form 8-K) Ex-4.1 (June 1, 2007) ...........................19

Fannie Mae, "Net Present Value Test" (Sept. 2012) ....................8, 9

Fannie Mae Servicing Guide Announcement SVC-2010-05 (Mar. 30, 2010) ..............................15

Fannie Mae Servicing Guide B-8.1-04 (2015) ...................7, 12, 15

Fannie Mae Servicing Guide F-1-22 (2015) ....................................15

Federal National Mortgage Association, Annual Report (Form 10-K) (Feb. 26,
   2010) ...............................................................................................8

Freddie Mac Single-Family Seller/Servicer Guide 61.4.1 (2015) ...............................................7, 15

Freddie Mac Single-Family Seller/Servicer Guide B65.16 (2015) ...........................................7, 15

H.R. Rep. No. 105-55 ..........................................................................................................3, 4

http://www.fhfa.gov .................................................................................................................6

http://www.merriam-webster.com/dictionary.......................................................................14, 15

http://www.treasury.gov/initiatives/financial-stability/TARP-
    Programs/housing/mha/Pages/default.aspx ..........................................................................8

Making Home Affordable Program, *Handbook for Servicers of Non-GSE
    Mortgages* (Version 3.0) (Dec. 2, 2010)........................................................................8, 9, 14

Making Home Affordable Program, *Home Affordable Modification Program
    Base Net Present Value (NPV) Model Specifications* (June 11, 2009)..............................9, 15

Making Home Affordable Program, Supplemental Directive 10-10 (Sept. 17,
    2010) ...................................................................................................................................8

S. Rep. No. 105-129 (1997) ...........................................................................................3, 4, 5, 17, 21

Defendants JPMorgan Chase Bank, N.A. ("Chase") and JPMorgan Chase & Co. ("JPMC") respectfully submit this Memorandum of Law in support of their motion to dismiss.

## PRELIMINARY STATEMENT

Plaintiff's complaint should be dismissed in its entirety because all of her claims rest on a faulty and nonsensical interpretation of a federal statute.

Plaintiff alleges that Chase miscalculated the date on which it should have terminated the private mortgage insurance that she was required to carry on her mortgage loan. Private mortgage insurance, or "PMI," is insurance that protects a lender from the risk that the borrower will fail to repay a mortgage loan. Lenders generally require borrowers to purchase PMI if they are unable to make a 20% down payment on their homes. Under the Homeowners Protection Act of 1998 ("HPA"), 12 U.S.C. §§ 4901 *et seq.*, any such borrower-paid PMI ordinarily must be terminated when borrowers are scheduled to achieve a 22% equity interest in their homes. Plaintiff alleges that Chase violated this termination requirement – and thereby violated both the HPA and New Jersey law – after she entered into a loan modification agreement that altered the terms of her loan.

Plaintiff's allegations rest on a fundamental misinterpretation of the HPA. As Plaintiff acknowledges in her complaint, the HPA required Chase to recalculate her PMI termination date after she modified her loan. Plaintiff argues, however, that this recalculated termination date should have reflected a hybrid mixture of (1) the amortization schedule generated by her *modified* loan, and (2) the value of the mortgaged property at the time of her *original* loan. According to Plaintiff, Chase violated these requirements by using the property value at the time of her loan modification, rather than the property value at the time of the original loan, to calculate her new PMI termination date. This mix-and-match interpretation of the HPA should be rejected for several reasons.

1

*First*, Plaintiff's interpretation is inconsistent with the plain language of the HPA. The HPA provides that when a mortgage loan is modified, the borrower's PMI termination date must be "recalculated" based on the "modified terms and conditions" of the loan. 12 U.S.C. § 4902(d). Here, the updated property value that Chase used in recalculating Plaintiff's termination date was one of the conditions of the loan modification. Indeed, Plaintiff obtained her loan modification under a government program that *mandates* use of an updated property value to determine a borrower's eligibility for a modification. The HPA therefore required Chase to use this updated property value in recalculating Plaintiff's PMI termination date.

*Second*, Plaintiff's interpretation conflicts with the HPA's statutory purpose. As the Act's legislative history explains, the HPA was intended to terminate PMI only after borrowers accumulate sufficient equity in their homes to protect the lender from an undue risk of loss. Plaintiff's interpretation of the HPA would frustrate that purpose by requiring the use of outdated and inaccurate property values when recalculating PMI termination dates for modified loans. For example, if the value of a property declines between the date of an original loan and the date of a loan modification, Plaintiff's approach would understate the risk that the lender faces on the modified loan, thus requiring the premature termination of PMI before the lender is adequately protected. Conversely, if the value of a property rises between the date of an original loan and the date of a loan modification, Plaintiff's approach would overstate the risk to the lender on the modified loan, thus requiring borrowers to continue paying for PMI that serves little useful purpose. Under settled principles of statutory construction, this Court should decline to interpret the HPA in a manner that leads to these unintended and irrational results. Nor should the Court permit Plaintiff to obtain a loan modification based on an updated value of her property and then ignore that property value for purposes of calculating her PMI termination date under the HPA.

*Third*, Plaintiff's interpretation of the HPA would reverse the longstanding and widely-followed interpretation of the Federal National Mortgage Association ("Fannie Mae"). Fannie Mae is a quasi-governmental entity that exercises enormous influence over the residential mortgage market. Fannie Mae has long interpreted the HPA to require the use of updated property values when calculating PMI termination dates for modified loans. In fact, Fannie Mae's mortgage servicing guide expressly *requires* servicers to use updated property values for modified loans. Plaintiff's interpretation of the HPA thus conflicts with the settled interpretation of the statute by a quasi-governmental entity, and would unfairly punish all industry participants that operated in conformity with Fannie Mae's requirements.

Both Plaintiff's HPA claim and her tag-along claims under New Jersey law fail for these reasons. Plaintiff's HPA claim also fails because it is time-barred. Further, her state-law claims also fail because they are (1) preempted by the HPA and (2) inadequately pleaded. For all those reasons, the complaint should be dismissed with prejudice and without leave to amend.

<u>BACKGROUND AND SUMMARY OF THE ALLEGATIONS</u>

A.     **The Homeowners Protection Act**

In 1998, Congress passed the HPA, which established uniform federal standards for the termination of PMI and uniform disclosure obligations for mortgage lenders.

PMI is borrower-paid mortgage insurance that "protects lenders – or the ultimate purchaser of a mortgage loan, such as Fannie Mae" – "against financial loss if a borrower defaults on a mortgage loan." H.R. Rep. No. 105-55, at 11 (1997), *available at* 1997 WL 188469. PMI is commonly used to facilitate "loans in which the loan to value ratio … is more than 80 percent, *i.e.*, the borrower makes a down payment of less than 20 percent." S. Rep. No. 105-129, at 2 (1997), *reprinted in* 1998 U.S.C.C.A.N. 313, 314. As Congress has recognized, PMI "plays an important role in the mortgage industry by allowing low-income borrowers or

3

borrowers with little cash greater access to home ownership." H.R. Rep. No. 105-55, at 5.

Without PMI, lenders would be unlikely to extend credit to would-be homebuyers who are

unable to make a 20% down-payment. *See* S. Rep. No. 105-129, at 2; *see also* Compl. ¶ 13

("PMI allows the lender to make loans in excess of 80% of the home's value by providing a

guarantee from a dependable third party – the provider of PMI – to protect the lender in the event

of a default by the borrower.").

      In enacting the HPA, Congress recognized that "PMI is a beneficial financial product."

S. Rep. No. 105-129, at 3. Congress also recognized that lenders "must have the flexibility to

require PMI coverage in a slumping market, when depreciation may eliminate accumulated

equity." *Id.* at 4.[1] Accordingly, the HPA was intended to eliminate PMI requirements only after

PMI became "unnecessary" – *i.e.*, "when the homeowner's equity investment in the residence

gives the lender sufficient security." *Id.* at 3.[2]

---

[1]     *See also* 143 Cong. Rec. 5660 (1997) (statement of Rep. Hansen) ("I would not want to see automatic cancellation provisions prevent lenders from insuring themselves against … a severely depreciated real estate market."); 143 Cong. Rec. 5666 (1997) (statement of Rep. Sessions) ("I also want to ensure that the automatic cancellation standards are set at a reasonable level to protect both the consumer and the mortgage industry from problems such as downturns in the economy….").

[2]     *See also* 144 Cong. Rec. 15,267 (1998) (statement of Rep. LaFalce) ("The problem with PMI arises once you have established approximately 20 percent equity in your home. This is the figure generally accepted by the mortgage industry as a benchmark of the risk they take in financing your home. At that point, PMI should no longer be necessary, since there is minimal risk to the lender."); 144 Cong. Rec. 15,269 (1998) (statement of Rep. Castle) ("I think that the Homeowners Protection Act is just good common sense protection for homeowners across the United States of America to protect them when they have paid down their private mortgage insurance sufficiently so that there is enough equity in their home, and the various mortgages companies will be protected."); 143 Cong. Rec. 25,694 (1997) (statement of Sen. D'Amato) (explaining that "private mortgage insurance is no longer necessary" when "the homeowners would have a 20-percent equity stake in his or her home"); 143 Cong. Rec. 5661 (1997) (statement of Rep. Leach) ("Homeowners should not be stuck with paying insurance to protect others on a home that becomes protected by its own collateral value.").

The HPA achieves this goal by requiring lenders automatically to terminate PMI coverage for borrowers in good standing after certain conditions are met. Specifically, lenders ordinarily must terminate PMI on a "termination date" defined as follows:

> the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

12 U.S.C. § 4901(18)(A); *see id.* § 4902(b).[3] As Plaintiff acknowledges, "the actual principal balance does not matter" for purposes of calculating this termination date. Compl. ¶ 29. Rather, the HPA requires lenders to terminate PMI when the outstanding loan balance is scheduled to reach 78% of the value of the property – *i.e.*, a 22% equity stake – under the initial amortization schedule for the mortgage.

The HPA also contains a specific provision regarding loan modifications. After a mortgage loan is modified, the statute requires lenders to "recalculate" the borrower's PMI termination date "to reflect the *modified terms and conditions* of such loan." 12 U.S.C. § 4902(d) (emphasis added).[4]

In order to "minimize compliance costs" with its requirements, the HPA contains "broad preemptive language … with respect to state laws." S. Rep. No. 105-129, at 9. Thus, the HPA

---

[3]     For certain types of especially risky loans, PMI is not required to terminate until the "final termination date" – *i.e.*, the point at which the loan reaches the mid-point of its amortization schedule. *See* 12 U.S.C. § 4902(c), (g). The HPA also contains provisions allowing qualifying buyers to attempt to cancel their PMI prior to the applicable termination date. *See id.* § 4902(a).

[4]     This provision did not appear in the HPA as originally enacted. Rather, it was added in 2000 by the "Private Mortgage Insurance Technical Corrections and Clarification Act." *See* Pub. L. 106-569, § 402(c)(1)(B), 114 Stat. 2944, 2956. The purpose of that act, however, was not to "chang[e] policy or add[] new provisions but only" to "clarify the bill's original intent." 146 Cong. Rec. 8908 (2000) (statement of Rep. LaFalce).

"supersede[s] any provisions of the law of any State relating to" the "cancellation or automatic termination of … private mortgage insurance" or "any disclosure of information" relating thereto.  12 U.S.C. § 4908(a)(1).

**B.      Fannie Mae and Freddie Mac**

Fannie Mae and the Federal Home Loan Mortgage Corporation ("Freddie Mac") are "quasi-governmental" entities established by Congress "to provide liquidity, stability and affordability to the mortgage market."[5]  In 2008, Fannie Mae and Freddie Mac were placed into conservatorship by the Federal Housing Finance Agency.  *See* http://www.fhfa.gov /Conservatorship/Pages/History-of-Fannie-Mae--Freddie-Conservatorships.aspx.  Since that time, they have received financial support from the U.S. Treasury Department, and the Federal Housing Finance Agency has "assumed the authority of the[ir] management and boards."  *Id.*

To carry out their statutory mandate of increasing liquidity in the housing market, Fannie Mae and Freddie Mac "buy mortgages from lenders and either hold these mortgages in their portfolios or package the loans into mortgage-backed securities" for sale.  *See* http://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx.  By "guaranteeing the timely payment of principal and interest on" the mortgages underlying those securities, Fannie Mae and Freddie Mac "attract to the secondary mortgage market investors who might not otherwise invest in mortgages, thereby expanding the pool of funds available for housing."  *Id.*

---

[5]      *See* http://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/ About-Fannie-Mae---Freddie-Mac.aspx; *see also Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*, 903 F. Supp. 2d 274, 282 n.5 (S.D.N.Y. 2012) ("Defendants strenuously resist any effort to equate Fannie Mae and Freddie Mac with the 'general public,' but [their] importance to the American economy and their quasi-governmental status is well established.").

Fannie Mae and Freddie Mac rely on third-party mortgage loan servicers such as Chase to service the loans that they purchase and guarantee.  These mortgage servicers, in turn, must follow detailed requirements set forth in Fannie Mae and Freddie Mac's Servicing Guides when servicing loans for Fannie Mae and Freddie Mac.  Fannie Mae's Servicing Guide expressly requires servicers to use the "property value at the time of the mortgage loan modification" in calculating PMI termination dates for modified loans:

> The mortgage insurance termination eligibility criteria must be based on the terms and conditions of the modified mortgage loan. *The servicer must use the amortization schedule of the modified mortgage loan and <u>the property value at the time of the mortgage loan modification</u>,* and adhere to applicable state law related to the type of valuation to use to determine the property value at the time of the mortgage loan modification.  A BPO or a new appraisal may be used….

Fannie Mae Servicing Guide B-8.1-04 (emphasis added).[6]  Freddie Mac's requirements are similar.[7]

Taken together, Fannie Mae and Freddie Mac "own or guarantee close to half of the home loans in the United States."  *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 225 (2d Cir. 2012). As a result, mortgage lenders and servicers ordinarily "are guided in their decisions by Fannie Mae and Freddie Mac requirements."  *Id.* (internal quotation marks omitted).

### C.    The Home Affordable Modification Program

"In early 2009, the [U.S. Department of the] Treasury launched the Making Home Affordable Program (MHA) to help struggling homeowners avoid foreclosure."  *See*

---

[6]    *Available at* https://www.fanniemae.com/content/guide/servicing/b/index.html (expand B-8 list; then follow B-8.1-04 hyperlink).

[7]    *See* Freddie Mac Single-Family Seller/Servicer Guide 61.4.1, *available at* http://www.freddiemac.com/singlefamily/guide/.

http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Pages
/default.aspx.  "The cornerstone of MHA is the Home Affordable Modification Program," or
HAMP, "which provides eligible homeowners the opportunity to reduce their monthly mortgage
payments to more affordable levels."  *Id.*; *see* Compl. ¶ 30 & n.1 (discussing HAMP).  In 2009,
Treasury appointed Fannie Mae to serve as the Program Administrator for HAMP.  *See* Federal
National Mortgage Association, Annual Report 40 (Form 10-K) (Feb. 26, 2010), *available at*
http://www.fanniemae.com/resources/file/ir/pdf/proxy-statements/form10k_022610.pdf.

     Under HAMP, mortgage servicers apply "a uniform loan modification process to provide
eligible borrowers with sustainable monthly payments for their first lien mortgage loans."
Making Home Affordable Program, Supplemental Directive 10-10, at 1 (Sept. 17, 2010),
*available at* https://www.hmpadmin.com/portal/programs/docs/rd_hamp/sd1010.pdf.  As part of
this uniform process, Treasury requires servicers to obtain an updated valuation for the property
securing the mortgage loan:

> Servicers must obtain an assessment of the current value of the
> property securing the mortgage loan being evaluated for HAMP.
> Servicers may use … a broker's price opinion (BPO) or an
> appraisal.

Making Home Affordable Program, *Handbook for Servicers of Non-GSE Mortgages* 73 (Version
3.0) (Dec. 2, 2010) [hereinafter "MHA Handbook"].[8]  Treasury also requires that "the property
valuation used cannot be more than 90 days old."  *Id.* at 73.

     The updated property values required by Treasury are used to determine whether
borrowers qualify for HAMP modifications.  As part of the HAMP application process, servicers
must perform a "net present value" or "NPV" calculation for each loan.  Fannie Mae, "Net

---

[8]    *Available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/
mhahandbook_30.pdf.

Present Value Test" (Sept. 2012).[9]  A servicer is generally required to approve a HAMP modification only if the modification is "NPV positive" – *i.e.*, "[i]f the expected value to the lender of the loan after a HAMP modification exceeds the expected value of the same loan to the lender if it is not modified."  Making Home Affordable Program, *Home Affordable Modification Program Base Net Present Value (NPV) Model Specifications* 1-2 (June 11, 2009) [hereinafter "Base NPV Model Overview"].[10]  One important input for this NPV calculation is the "value of the home" at the time of the proposed loan modification.  *Id.* at 3.  In short, an updated property value is a mandatory prerequisite for a HAMP loan modification.

### D.    Plaintiff's Mortgage Loan and HAMP Loan Modification

According to the complaint, Plaintiff purchased a home in Teaneck, New Jersey, in 2007 for $553,330.  Compl. ¶¶ 6, 47.  She financed the purchase with a $497,950 mortgage loan from Chase.  *Id.*  Because the loan-to-value ratio for the mortgage exceeded 80%, Plaintiff was required to purchase PMI.  *Id.* ¶¶ 47-48.  Plaintiff's PMI termination date based on her unmodified mortgage loan was March 1, 2016.  *Id.* ¶ 48.

In January 2011, after experiencing an alleged financial hardship, Plaintiff applied for and entered into a HAMP loan modification agreement with Chase.  *Id.* ¶ 49.  Under the terms of that agreement, Plaintiff's monthly payments were reduced and the principal balance on her loan was adjusted to $463,736.98.  *See id.*

As Plaintiff acknowledges, her loan modification agreement with Chase does not mention the "Original Value" of her property – *i.e.*, the 2007 purchase price.  *Id.* ¶ 51.  Instead, for

---

[9]    *Available at* https://www.fanniemae.com/content/fact_sheet/npv-test-about.pdf.

[10]    *Available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/ npvoverview.pdf.

9

purposes of Plaintiff's loan modification, Chase obtained and relied upon a broker price opinion that valued her property at $420,000. *See id.* ¶ 54; *see also id.* ¶ 38 ("When Chase processes a loan modification it also makes an assessment of a home's value at the time of the modification using a BPO."). Pursuant to HAMP's requirements, that new valuation was an integral aspect of the approval of Plaintiff's loan modification. *Supra* pp. 8-9.

Based on the modified terms and conditions of the loan – including the updated property valuation required for Plaintiff's loan modification – Chase computed the post-modification PMI termination date for Plaintiff's loan as November 1, 2026.[11] Compl. ¶ 54. Plaintiff alleges that Chase informed her of the recalculated termination date by letters dated August 31, 2012, and October 10, 2012. *Id.* ¶¶ 52-53.

### E.    Plaintiff's Allegations

The crux of Plaintiff's claims is that Chase incorrectly calculated the PMI termination date for her modified loan and therefore is "collect[ing] PMI beyond what is allowed under the HPA." *Id.* ¶ 37; *see id.* ¶¶ 71-72, 79, 85, 89, 96, 106, 116.

As Plaintiff acknowledges, the HPA requires servicers to "recalculate[]" a borrower's PMI termination date after a loan modification "to reflect the modified terms and conditions of such loan." Compl. ¶ 27. According to Plaintiff, however, the statute does not permit servicers to recalculate the termination date using the value of the property at the time of the loan modification. *Id.* ¶ 40. Instead, Plaintiff argues that Chase was required to recalculate her termination date using (1) the amortization schedule for the *modified* loan, but (2) the value of

---

[11]    78% of $420,000 is $327,600. As Plaintiff acknowledges, the principal balance under the terms of her modified loan is not scheduled to drop below $327,600 (without regard to any pre-payments) until November 1, 2026. Compl. ¶ 54.

the property at the time of the *initial* loan.  *Id.* ¶¶ 32-34.  Calculated in this manner, Plaintiff

alleges that her PMI termination date occurred in July 2014.  *Id.* ¶ 50.[12]

Plaintiff thus alleges that Chase violated the HPA by miscalculating her "true" PMI

termination date.  *E.g.*, *id.* ¶¶ 71-72.  Plaintiff also asserts a laundry list of claims under New

Jersey law.  *See generally id.* ¶¶ 74-117.  Each of these claims, however, depends entirely on the

erroneous premise that Chase incorrectly applied the HPA to her modified loan.

## STANDARD OF REVIEW

To overcome a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

plaintiff must articulate "enough facts to state a claim to relief that is plausible on its face."  *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible only "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  *Id.*

In resolving questions of statutory interpretation, the Court may rely on information

outside the four corners of the complaint.  *See, e.g.*, *Gager v. Dell Fin. Servs., LLC*, 727 F.3d

265, 268-73 (3d Cir. 2013) (considering legislative history and FCC guidance in interpreting

statute on a motion to dismiss).  The Court may also consider "matters of public record."  *See*

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *see*

*also Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 273 & n.11

(3d Cir. 2007) (considering FDA announcement on motion to dismiss); *Oran v. Stafford*, 226

---

[12]    78% of $553,330 is $431,597.40.  Compl. ¶ 47.  According to Plaintiff, the principal
balance under the terms of her modified loan was scheduled to drop below $431,597.40 (without
regard to pre-payments) in July 2014.  *Id.* ¶ 50.

F.3d 275, 289 (3d Cir. 2000) (considering SEC filings on motion for judgment on the pleadings). Finally, the Court may consider contracts or other documents upon which "the plaintiff's claims are based." *White Consol. Indus., Inc.*, 998 F.2d at 1196.

## ARGUMENT

## I.    CHASE PROPERLY CALCULATED PLAINTIFF'S TERMINATION DATE.

Each of Plaintiff's claims rests on the counterintuitive premise that Chase should have calculated the PMI termination date for her modified loan using (1) the amortization schedule established by her modified loan, but (2) the property value at the time of her initial loan. Plaintiff takes this position notwithstanding the fact that she only qualified for her loan modification as a result of the updated value of her property at the time of the modification. This economically irrational approach is inconsistent with the statutory text, the statutory purpose, and common sense.

The overriding purpose of the HPA was to eliminate PMI after it becomes "unnecessary," *i.e.*, after a borrower achieves enough equity in the property that the lender is likely to be protected from default. For modified loans, the statute achieves this goal by requiring lenders to use the "modified terms and conditions" of the loan – including the updated property value obtained in connection with the loan modification – in recalculating the borrower's PMI termination date. *See* 12 U.S.C. § 4902(d). Using the updated property value ensures adequate PMI coverage where property values have fallen. It also ensures that borrowers are not forced to pay "unnecessary" PMI when property values have risen. Consistent with these statutory purposes, Fannie Mae expressly requires mortgage servicers to recalculate PMI termination dates using "the property value at the time of the mortgage loan modification." Fannie Mae Servicing Guide B-8.1-04, *supra* note 6.

Plaintiff nevertheless insists that lenders and servicers are required to ignore the value of the property at the time of a loan modification when calculating PMI termination dates for modified loans.  As shown below, there is no sound basis for this strained approach to the HPA.

### A.   Principles of Statutory Construction

The starting point for the interpretation of a statute is its text; if the language of the statute is unambiguous, the analysis should "end there." *In re Price*, 370 F.3d 362, 368 (3d Cir. 2004).  "The plainness or ambiguity of statutory language," however, is determined not merely "by reference to the language itself," but also to "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).  Accordingly, the "meaning – or ambiguity – of certain words or phrases may only become evident when placed in context." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (internal quotation marks omitted); *see also id.* ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (internal quotation marks omitted)); *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) ("[W]e must … interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." (internal quotation marks omitted)).

Statutory construction also "must be guided to a degree by common sense." *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120, 133 (2000).  Courts therefore avoid constructions of statutes that are "inconsistent with economic reality," *United States v. State of N.J., Violent Crimes Comp. Bd.*, 831 F.2d 458, 462 (3d Cir. 1987), or that produce "unreasonable results," *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982).  Finally, when the text of a statute is not dispositive on its own, it is "appropriate to consider legislative history." *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 244 (3d Cir. 2009).

**B.    The Plain Language of the HPA Required Chase To Use the Updated Value of Plaintiff's Property in Calculating Her PMI Termination Date.**

According to Plaintiff, PMI termination dates for modified loans should be calculated using (1) the amortization schedule established by the *modified* loan, but (2) the property value established at the time of the *un*modified loan.   *See, e.g.*, Compl. ¶¶ 32-34. That argument ignores the fact that the HPA requires lenders to calculate PMI termination dates using the "terms *and conditions*" of a modified loan – a phrase that plainly and logically includes an updated property value obtained as a condition of a loan modification.  *See* 12 U.S.C. § 4902(d) (emphasis added).

The updated property value that Chase used to recalculate Plaintiff's PMI termination date was among the "conditions" of her loan modification within the meaning of the HPA. Because the HPA does not define the word "condition," the Court may consult the dictionary to establish the "ordinary meaning" of the term.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012).  The dictionary defines a "condition" as "something essential to the appearance or occurrence of something else."  *See* http://www.merriam-webster.com/dictionary/condition.  Here, an updated property value was "essential to the appearance or occurrence" of Plaintiff's loan modification:  even Plaintiff acknowledges that the loan modification would not have occurred without the updated property value.  *See* Compl. ¶ 38.  Plaintiff's updated property value was thus a "condition" of her loan modification.

The fact that Plaintiff's loan modification occurred pursuant to HAMP reinforces this conclusion.  As discussed above, Treasury Department rules state that lenders "*must* obtain an assessment of the current value of the property" in connection with a HAMP modification. MHA Handbook 73, *supra* note 8 (emphasis added).  Among other things, a current property value is an essential ingredient of the net present value formula that qualifies a borrower for

14

HAMP.  *See* Base NPV Model Overview 3, *supra* note 10.  For this reason as well, an updated property value was among the essential "conditions" of Plaintiff's loan modification.[13]

Longstanding Fannie Mae guidance further reinforces the conclusion that an updated property value was a "condition" of Plaintiff's loan modification.  In 2010, Fannie Mae issued an official Announcement that explained how mortgage servicers should calculate PMI termination dates for modified loans.  Fannie Mae Servicing Guide Announcement SVC-2010-05 (Mar. 30, 2010).[14]  The Announcement begins by tracking the language of the HPA, stating that termination dates should be calculated "based on the terms and conditions of the modified loan." *Id*. at 2.  The Announcement then goes on to specify exactly what this means:  it means that the "servicer must use … *the value of the property at the time of the modification*" to recalculate the borrower's PMI termination date.  *Id.* (emphasis added).  Each version of Fannie Mae's Servicing Guide since 2010 has contained similar language.[15]  Fannie Mae, a quasi-governmental entity that has been run by the federal government since 2008, thus interprets the HPA in precisely the way that Chase does.

Any remaining doubt about the proper interpretation of the statute is eliminated by the fact that the statute's loan modification provision is the only place that the HPA refers to the "terms *and conditions*" of mortgage loan agreements.  *See* 12 U.S.C. § 4902(d) (emphasis added).  Elsewhere in the HPA, Congress referred solely to the "terms" of such agreements.  *See,*

---

[13]     HAMP is far from unique in requiring servicers to obtain a current property valuation in order to consider a borrower's eligibility for a loan modification.  For example, both Fannie Mae and Freddie Mac require updated valuations in connection with "standard" modifications of loans owned or securitized by those entities.  *See* Fannie Mae Servicing Guide F-1-22, *available at* https://www.fanniemae.com/content/guide/servicing/f/1/22.html; Freddie Mac Single-Family Seller/Servicer Guide B65.16, *available at* http://www.freddiemac.com/singlefamily/guide/.

[14]     *Available at* https://www.fanniemae.com/content/announcement/svc1005.pdf.

[15]     *See, e.g.*, Fannie Mae Servicing Guide B-8.1-04, *supra* note 6.

*e.g.*, *id.* § 4901(6) (defining the phrase "amortization schedule then in effect" by reference to "the most recent schedule under the *terms* of the note or mortgage" (emphasis added)); *id.* § 4902(a)(3) (requiring a borrower to be "current on the payments required by the *terms* of the residential mortgage transaction" in order to cancel PMI (emphasis added)).

Where, as here, "Congress includes particular language in one section of a statute but omits it from another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 165 (3d Cir. 2015) (internal quotation marks omitted). The HPA's reference to the "terms and conditions" of a loan modification agreement must therefore refer to something broader than the "terms" of the agreement standing alone. The broader meaning is clear: the "conditions" of a loan modification include the mandatory prerequisites for a modification such as the requirement of an updated property value. Any other conclusion would leave the word "conditions" without meaning, in violation of the rule that courts should interpret statutes "so as to 'give effect to every word of [the] statute.'" *Id.* (quoting *Leolocal v. Ashcroft*, 543 U.S. 1, 12 (2004)).

For all these reasons, the updated value of Plaintiff's property was a "condition" of her loan modification within the meaning of the HPA.

### C. Plaintiff's Contrary Interpretation of the HPA Conflicts with Common Sense and the Statutory Purpose.

Although the text of the HPA requires that PMI termination dates be recalculated using the "terms and conditions" of a modified loan, 12 U.S.C. § 4902(d), Plaintiff argues that her termination date should have been recalculated using only *some* of the "terms and conditions" of her modified loan. Specifically, she argues that her termination date should be calculated using the updated amortization schedule generated by her modified loan, but the outdated property

16

value established at the time of her initial loan.  Even if that interpretation were a permissible construction of the statutory text (and it is not), it would still be defective under well-established principles of statutory construction.

*First*, Plaintiff's interpretation of the HPA conflicts with the statutory purpose and economic reality.  In drafting the HPA, Congress recognized that lenders "must have the flexibility to require PMI coverage in a slumping market, when depreciation may eliminate accumulated equity."  S. Rep. No. 105-129, at 4.  Accordingly, Congress intended to require termination of PMI only after PMI becomes "unnecessary," *i.e.*, after borrowers accumulate sufficient equity in their homes to protect their lender from an undue risk of loss.  *See id.* at 3-4; *see also supra* notes 1 & 2.

Plaintiff nonetheless construes the HPA to prohibit lenders from considering changes in property values that she admits are often associated with loan modifications (and indeed was associated with Plaintiff's modification).  *See* Compl. ¶ 31.  Thus, under Plaintiff's interpretation of the statute, lenders would often be forced to terminate PMI on modified loans even when PMI is still entirely "necessary," *i.e.*, when a lower property value at the time of the modification leaves the lender exposed to a substantial risk of loss.  In other situations, Plaintiff's interpretation would harm borrowers by allowing PMI payments to continue beyond the date when PMI serves any useful purpose, *i.e.*, when a higher property value at the time of a loan modification protects the lender from an undue risk of loss.  Congress cannot have intended these economically nonsensical results when it provided for the recalculation of PMI termination dates for modified loans.

*Second*, Plaintiff's interpretation of the statute conflicts with "common sense."  *Brown & Williamson Tobacco*, 529 U.S. at 133.  There is no dispute that lenders must recalculate PMI

termination dates for modified loans using the amortization table associated with the modified loan.  *See* Compl. ¶ 34.  The only dispute is whether lenders should *also* consider the updated property value associated with a modified loan in making that calculation.  It defies common sense to answer those questions differently:  there is no rational reason to consider an updated amortization schedule, but ignore an updated property value, when recalculating PMI termination dates – especially when the very existence of the loan modification depends on the updated property value.

Nor does it make any sense to suggest that the value of Plaintiff's property at the time of her original mortgage loan should be used in recalculating her PMI termination date when, by Plaintiff's own admission, the original property value is not even "mention[ed]" in the agreement that modified her loan.  *See id.* ¶ 51.  Plaintiff's attempt to rely on her updated property value for her modification but ignore it for purposes of calculating a PMI termination date for the modified loan should be rejected.

*Third*, Plaintiff's interpretation would upset the settled expectations of the mortgage industry.  As explained above, Fannie Mae's Servicing Guide has long advised mortgage servicers that they should calculate PMI termination dates using the property value at the time of a loan modification.  *See supra* p. 15.  Furthermore, in light of Fannie Mae's central role in the mortgage market, "it is not a stretch to assume that lenders … are guided in their decisions by Fannie Mae … requirements."  *Town of Babylon*, 699 F.3d at 230 (internal quotation marks omitted).  Adopting Plaintiff's interpretation of the HPA thus would penalize all lenders and

servicers that have acted in reliance on Fannie Mae's Servicing Guide – a group that presumably includes most or all significant participants in the industry.[16]

      Plaintiff's interpretation of the HPA also would place Fannie Mae's numerous loan servicers in an untenable bind.  Under her interpretation, it would be impossible for a loan servicer both to comply with its obligations under the HPA and to service loans in compliance with Fannie Mae's Servicing Guide.  Chase's interpretation of the HPA – an interpretation that comports with economic reality and common sense – is far superior to an interpretation that leads to these troubling results.

      **D.**    **Plaintiff's Experience Illustrates the Infirmity of Her Interpretation.**

      Plaintiff's own loan history exemplifies the unreasonable results produced by her interpretation of the HPA.

      According to the complaint, Plaintiff bought her property in 2007 for $553,330.  Compl. ¶ 47.  She obtained a 30-year, fixed-rate loan in the amount of $497,950.  *See id.*; Pistilli Decl. Ex. A.  Under the terms of Plaintiff's 2007 loan, her initial PMI termination date was March 1, 2016.  Compl. ¶ 48.

      In 2010, Plaintiff requested a loan modification due to an alleged financial hardship. Pursuant to HAMP requirements, Chase obtained a broker price opinion on Plaintiff's property

---

[16]      The importance of Fannie Mae's Servicing Guide to the residential mortgage market is underscored by Plaintiff's own mortgage.  Plaintiff's loan is owned not by Fannie Mae or Freddie Mac but by a private investor.  Consistent with common industry practice, however, the pooling and servicing agreement governing Plaintiff's loan requires Chase to follow Fannie Mae's guidelines in servicing the loan.  *See* Chase Mortg. Fin. Corp. and The Bank of N.Y. Trust Co., N.A. Multi-Class Mortgage Pass-Through Certificates/Series 2007-S5, Pooling & Servicing Agreement (Form 8-K) Ex-4.1, art. I (June 1, 2007), *available at* http://www.sec.gov/Archives/edgar/data/1402956/000089322007002421/w37034exv4w1.htm (definition of "accepted servicing practices" incorporates by reference Fannie Mae servicing practices as defined by the Servicing Guide); *id.* § 5.01 (requiring loan servicer to service in accordance with "accepted servicing practices").

which showed that the value of the property had dropped to $420,000. *Id.* ¶¶ 38, 54. After Plaintiff's loan modification was finalized in 2011, her principal balance increased to $463,736.98, while her monthly principal-and-interest payments dropped to $1518.80 (for the first five years after the modification). *Id.* ¶ 49. Plaintiff nonetheless asserts that her new PMI termination date should have been July 1, 2014, nearly two years *earlier* than her original termination date. *Id.* ¶¶ 6, 50.

Those facts illustrate the infirmity of Plaintiff's interpretation of the HPA. Due largely to the decline in the value of her property, Plaintiff had substantially less equity in her home in 2011 than in 2007. Indeed, at the time of her loan modification, Plaintiff had *negative* equity in her home: the outstanding loan balance exceeded the value of the property. *See id.* ¶¶ 49, 54. Despite all this, Plaintiff asserts that her PMI termination date should have been accelerated as a result of her loan modification. Under settled principles of statutory construction, this Court should avoid any interpretation of the HPA that leads to such economically irrational results.

## II.    PLAINTIFF'S HPA CLAIM IS TIME-BARRED.

Claims under the HPA must be brought within two years of the plaintiff's "discovery of the violation." *See* 12 U.S.C. § 4907(b) ("No action may be brought … later than 2 years after the date of the discovery of the violation that is the subject of the action."). Here, Plaintiff alleges that she discovered Chase's purported violation in 2012, but did not sue until 2015. Her HPA claim therefore is time-barred.

Plaintiff alleges that Chase violated the HPA by miscalculating her revised PMI termination date. *E.g.*, Compl. ¶¶ 71-72. Specifically, Plaintiff alleges that Chase improperly "adjusted [her] automatic cancellation date from March 1, 2016 to November 1, 2026" as a result of her loan modification. *See id.* ¶ 54. According to the complaint, however, Plaintiff discovered this alleged violation on or about August 31, 2012, when Chase sent her a letter

20

indicating that her PMI was "scheduled to automatically cancel on November 1, 2026." *Id.* ¶ 52. Plaintiff further alleges that Chase sent her an additional letter on October 10, 2012, which stated:

> Due to the completed loan modification on your mortgage account, your PMI is scheduled to automatically cancel without a need for an inspection on November 1, 2026.  This date is when the loan will reach 78% based on the modified terms and conditions.

*Id.* ¶ 53.  Accordingly, Plaintiff indisputably knew – by no later than October 2012 – that Chase had recalculated her PMI termination date in a manner that she believed violated the HPA.  *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) (holding under a similar statute of limitations that a plaintiff is deemed to know all of the facts that a "reasonably diligent plaintiff would have known").

Plaintiff filed her complaint in this action on April 8, 2015, more than two years after October 2012.  *See* ECF Dkt. No. 1.  Her claim under the HPA is therefore time-barred.

## III.   PLAINTIFF'S STATE-LAW CLAIMS ARE PREEMPTED.

The crux of Plaintiff's state-law claims is that Chase allegedly miscalculated – and consequently misrepresented – her "true" termination date.  *See, e.g.*, Compl. ¶¶ 79, 85, 89, 93-94, 102, 104, 115-16.  The HPA, however, broadly preempts state-law claims "relating to" its requirements for terminating PMI or "any disclosure of information" relating thereto.  *See* 12 U.S.C. § 4908(a)(1).  Accordingly, Plaintiff's state-law claims are preempted by the HPA.

In order to minimize the regulatory burden created by the HPA, Congress included "broad preemptive language [to] minimize compliance costs with respect to state laws."  S. Rep. No. 105-129, at 9.  Specifically, the HPA provides that it "*shall supersede any provisions of the law of any State <u>relating to</u>*"–

> requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions,

cancellation or automatic termination of such private mortgage
insurance, any disclosure of information addressed by this chapter,
and any other matter specifically addressed by this chapter.

12 U.S.C. § 4908(a)(1) (emphasis added).

Congress's use of the phrase "relating to" in the HPA signals its "expansive intent."  *See
Gul v. Attorney Gen. of U.S.*, 385 F. App'x 241, 243 (3d Cir. 2010) ("Congress's use of the
phrase 'relating to' in federal legislation generally signals its expansive intent." (quoting *Mizrahi
v. Gonzalez*, 492 F.3d 156, 159 (2d Cir. 2007))).  Numerous federal courts have construed the
same phrase in the preemption provisions of other federal statutes, including the Employee
Retirement Income Security Act of 1978 ("ERISA").  Accordingly, it is appropriate to consult
those judicial decisions in construing the reach of the HPA's preemption provision.  *See Rowe v.
N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) ("[W]hen judicial interpretations have
settled the meaning of an existing statutory provision, repetition of the same language in a new
statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well."
(internal quotation marks omitted)).

ERISA "supersede[s] any and all State laws insofar as they … *relate to* any employee
benefit plan."  29 U.S.C. § 1144(a) (emphasis added).  In interpreting this provision, the
Supreme Court has held that "[a] law 'relates to' an employee benefit plan, in the normal sense
of the phrase, if it has a connection with or reference to such a plan."  *Shaw v. Delta Air Lines,
Inc.*, 463 U.S. 85, 96-97 (1983).  "Under this 'broad common-sense meaning,' a state law may
'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed
to affect such plans, or the effect is only indirect."  *Ingersoll-Rand Co. v. McClendon*, 498 U.S.
133, 139 (1990).  Generally applicable state laws that provide "alternative enforcement
mechanisms also relate to ERISA plans" and are therefore preempted.  *N.Y. State Conference of
Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995).

22

Relying on this case law, courts have held "that the preemptive reach of the HPA is expansive" and that "the HPA preempts all state laws that have 'a connection with' or 'reference to' requirements for, *inter alia*, cancellation of PMI and disclosure of information concerning PMI cancellation." *Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 401 (S.D.N.Y. 2010). On that basis, the courts have dismissed as preempted state-law tort and quasi-contract claims, as well as claims arising under state consumer protection statutes. *See Gregor v. Aurora Bank FSB*, 26 F. Supp. 3d 146, 154 (D.R.I. 2014) (tort and unjust enrichment claims preempted); *Augustson v. Bank of Am., N.A.*, 864 F. Supp. 2d 422, 437-38 (E.D.N.C. 2012) (fraud, negligent misrepresentation, and unjust enrichment claims preempted); *Fellows*, 710 F. Supp. 2d at 402 (claim under deceptive trade practices act preempted).

*Gregor* is instructive.  There, the plaintiffs alleged that a bank falsely "represented that there was no mortgage insurance on the property." *See Gregor*, 26 F. Supp. 3d at 148.  Based on this allegation, the plaintiffs asserted a claim for violation of the HPA, as well as state-law tort and unjust enrichment claims, against the bank.  *Id*.  The court observed that "the conduct that forms the basis of Plaintiffs' state law claims duplicates precisely the conduct they claim violates the HPA." *Id.* at 154.  It therefore held that "the state law claims, if permitted to go forward, would [impermissibly] function as an alternate enforcement mechanism" for the HPA, and dismissed those claims as preempted.  *Id.*

The same reasoning applies here.  Each of Plaintiff's state-law claims plainly has a "connection with" or "reference to" the HPA's requirements for the termination of PMI.  Indeed, Plaintiff's claims are premised *entirely* on Chase's alleged failure to calculate her PMI termination date in accordance with the statute.  The conduct that underlies Plaintiff's state-law claims, moreover, is precisely the same conduct that underlies her HPA claim.  Thus, allowing

Plaintiff's state-law claims to go forward would impermissibly create an "alternate enforcement mechanism" to the civil enforcement scheme established under the HPA.

In sum, the Court should dismiss Plaintiff's state-law claims because permitting those claims to proceed "would frustrate Congress's objective of creating of a uniform national standard for PMI [termination] and disclosure." *Fellows*, 710 F. Supp. 2d at 402.

## IV.   PLAINTIFF FAILS PROPERLY TO ALLEGE THE ELEMENTS OF HER STATE-LAW CLAIMS.

Even if Plaintiff's interpretation of the HPA were correct, and even if her state-law claims were not preempted, those claims still would fail as a matter of law for the reasons explained below.

### A.   Plaintiff's Breach of Contract and Implied Covenant Claims Fail as a Matter of Law.

"To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements:  (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013).  Here, Plaintiff wholly fails to allege the second of those elements:  she alleges that Chase breached an obligation to use the "Original Value" of her property in recalculating her PMI termination date (*see* Compl. ¶¶ 76-79), but there is no such obligation in the parties' loan modification agreement.[17]

---

[17]     Plaintiff also alleges that Chase "disregard[ed]" the "amortization schedule established" by the loan modification agreement.  *See* Compl. ¶ 79.  As Plaintiff acknowledges elsewhere in the complaint, however, Chase used the amortization schedule established by the loan modification agreement in recalculating her PMI termination date.  *See, e.g., id.* ¶ 54 (admitting that use of the "amortization schedule resulting from the modification agreement" and the (continued…)

Nothing in the parties' contract (the loan modification agreement) required Chase to use Plaintiff's 2007 purchase price – which she refers to as the "Original Value" of her loan – when Chase recalculated her PMI termination date. As Plaintiff acknowledges, the loan modification agreement does not mention or rely in any way on the "Original Value" of her property. *See* Compl. ¶ 51. Indeed, the loan modification agreement does not address PMI or the calculation of PMI termination dates *at all*. *See* Pistilli Decl. Ex. B. Accordingly, the loan modification agreement did not require Chase to use the "Original Value" of Plaintiff's property in recalculating her PMI termination date.[18]

Nor does the implied covenant of good faith and fair dealing give rise to any such requirement. Under New Jersey law, the implied covenant provides "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126-27 (N.J. 2001) (internal quotation marks omitted). Although the implied covenant may be breached even where the express terms of a contract are not violated, it cannot be used to create new obligations out of whole cloth. *See generally Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 580 (D.N.J. 2010). Rather, "there must be some relationship to the provisions of the

---

updated property valuation obtained by Chase in connection with the loan modification result in a PMI termination date of November 1, 2026).

[18]    The parties' original mortgage agreement required Plaintiff to "pay the premiums required to maintain Mortgage Insurance … until termination is required by Applicable Law." *See* Pistilli Decl. Ex. A, at 8. This provision, however, did not impose an obligation on *Chase*. Moreover, to the extent Plaintiff means to argue that Chase breached an express or implied contractual obligation to follow "[a]pplicable [l]aw" in calculating her PMI termination date, that claim would be squarely preempted by the HPA. *See, e.g.*, *Barzelis v. Flagstar Bank, F.S.B.*, 784 F.3d 971, 974 (5th Cir. 2015) ("[B]orrowers may not disguise … statutory violations as breach-of-contract claims to avoid preemption by relying on clauses stating that the agreement is subject to applicable law."). In any event, Chase *did* recalculate Plaintiff's PMI termination date in accordance with applicable law. *See supra* Part I.

contract itself to invoke the duty of good faith." *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 170 (3d Cir. 2013) (applying Pennsylvania law).  Here, there is simply no contractual basis for implying an obligation on the part of Chase to calculate PMI termination dates using the "Original Value" of Plaintiff's home.

The implied covenant, moreover, cannot be used to override the express terms of an agreement. *See, e.g.*, *Cargill Global Trading*, 706 F. Supp. 2d at 580.  Here, Plaintiff agreed to pay PMI "until termination is required by Applicable Law."  Pistilli Decl. Ex. A, at 8. Accordingly, the implied covenant cannot be used to alter that express contractual commitment.

For all these reasons, Plaintiff's breach of contract and implied covenant claims should be dismissed as a matter of law.

**B.      Plaintiff's Unjust Enrichment Claim Fails as a Matter Of Law.**

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994).  Here, Plaintiff fails to establish either of these elements.

*First*, Chase does not possess or retain the PMI payments that Plaintiff makes.  Rather, as the complaint acknowledges, Plaintiff's PMI premiums are paid into escrow for the benefit of an "unaffiliated third-party" insurance company.  *See* Compl. ¶ 15; *see also id.* ¶¶ 12-18; Pistilli Decl. Ex. A, at 4-5.  Accordingly, Plaintiff's unjust enrichment claim fails as a matter of law. *See, e.g.*, *Dobroshi v. Bank of Am., N.A.*, 65 A.D.3d 882, 885 (N.Y. App. Div. 2009) (affirming dismissal of unjust enrichment claim against bank because it "did not retain" allegedly excessive closing costs paid by plaintiff).

*Second*, Plaintiff fails to allege that there is anything unjust about her mortgage insurance carrier retaining her PMI premium payments.  Plaintiff agreed to pay PMI until termination was

required by "Applicable Law" and, under the HPA, Plaintiff's PMI termination date is not until November 1, 2026. *See supra* Part I. Accordingly, there is nothing unjust about the insurer's retention of Plaintiff's PMI premium payments.

      **C.**    **Plaintiff's Negligent Misrepresentation Claim Fails as a Matter of Law.**

"[T]o prevail on a negligent misrepresentation claim, a plaintiff must prove that [1] the defendant negligently made an incorrect statement, [2] upon which the plaintiff justifiably relied." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 529 (D.N.J. 2008) (internal quotation marks omitted). Plaintiff does not adequately allege either of these elements.

As a threshold matter, Plaintiff fails properly to allege that Chase made a misrepresentation. According to Plaintiff, Chase misrepresented her PMI termination date. *E.g.*, Compl. ¶¶ 93-94. For the reasons explained above, however, Chase properly calculated her termination date as November 1, 2026, and communicated that date to Plaintiff. *See id.* ¶¶ 52-54; *supra* Part I. Accordingly, Plaintiff fails to allege that Chase made an "incorrect statement."

Plaintiff also fails to allege the required element of reliance. According to the complaint, Chase allegedly first "misrepresented" her PMI termination date in an August 31, 2012 letter. Compl. ¶ 52. Plaintiff, however, did not accept Chase's representation that her new termination date was November 1, 2026. To the contrary, Plaintiff alleges that she repeatedly "questioned the misrepresentations in the August 31, 2012 letter" after receiving it. *Id.* ¶ 53. Because Plaintiff did not believe Chase's alleged misrepresentations, she cannot establish that she relied on those statements. *See DSK Enters., Inc. v. United Jersey Bank*, 459 A.2d 1201, 1206 (N.J. Super. Ct. App. Div. 1983) (no reasonable reliance where "party to whom representations are made nevertheless chooses to investigate the relevant state of facts for himself"); *Nat'l Premium Budget Plan Corp. v. Nat'l Fire Ins. Co. of Hartford*, 234 A.2d 683, 717 (N.J. Super. Ct. Law Div. 1967), *aff'd*, 254 A.2d 819, 821 (N.J. Super. Ct. App. Div. 1969) (no reasonable reliance

27

where plaintiff "did not believe" defendant's statements); *see also Applied Image Reprographics, Inc. v. Citizens Bank of Mass.*, No. SUCV200505058A, 2012 WL 2913528, at *9 (Mass. Super. Ct. June 5, 2012) (no reasonable reliance where plaintiff paid money "under protest" and despite the belief that the money was not owed).  The Court should therefore dismiss Plaintiff's negligent misrepresentation claim.

      **D.**      **Plaintiff's TCCWNA Claim Fails as a Matter of Law.**

      Plaintiff's claim under the New Jersey Truth in Consumer Contract, Warranty and Notice Act ("TCCWNA") fails as a matter of law.

      The TCCWNA prohibits a lender from entering into a "written consumer contract" that violates (1) "any clearly established legal right of a consumer," or (2) "any clearly established … responsibility" of the lender.  N.J. Stat. Ann. § 56:12-15 (West).  In order to state a claim under the statute, a plaintiff is required "to identify a particular contract provision" that violates a clearly established right or responsibility.  *See Billings v. TD Bank, NA*, No. 13-2969, 2013 WL 3989572, at *5 (D.N.J. Aug. 1, 2013); *see also Slack v. Suburban Propane Partners, L.P.*, No. 10-2548, 2010 WL 5392845, at *6 (D.N.J. Dec. 22, 2010) ("Plaintiffs' failure to identify *which* contractual provision allegedly violated a clearly established right … renders this claim deficient as a matter of law.").

      Here, Plaintiff fails to identify a specific contractual provision that allegedly violated "clearly established" law.  Nor could she do so:  the only provision of the parties' agreements addressing PMI merely requires Plaintiff to "pay the premiums required to maintain Mortgage Insurance … until termination is required by Applicable Law."  *See* Pistilli Decl. Ex. A, at 8. Accordingly, her TCCWNA claim should be dismissed for failure to state a claim.

## V.   PLAINTIFF FAILS TO STATE A CLAIM AGAINST JPMC.

A complaint must allege sufficient facts to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011) (internal quotation marks omitted).  Plaintiff has not alleged any facts suggesting that JPMC played a role in the conduct alleged in the complaint – nor could she.  The Court should therefore dismiss all claims against JPMC.

Per the complaint, JPMC is the holding company that owns JPMorgan Chase Bank, N.A. *See* Compl. ¶¶ 7-8.  As the complaint acknowledges, Chase conducts its "home lending" operations through JPMorgan Chase Bank, N.A., *not* JPMC.  *See id.*  JPMC is neither the lender on Plaintiff's mortgage loan nor a party to her loan modification agreement.  *See* Pistilli Decl. Exs. A & B.  Plaintiff nevertheless repeatedly lumps JPMorgan Chase Bank, N.A. and JPMC together as "Defendants" or "Chase" in the complaint, without ever providing any specific indication of JPMC's purported role in the alleged wrongdoing.

Courts routinely dismiss claims against bank holding companies where, as here, the complaint does not distinguish between the alleged acts of the holding company and its operating bank subsidiaries.  *E.g.*, *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481 KBF, 2015 WL 1344429, at *3 (S.D.N.Y. Mar. 23, 2015) (dismissing holding companies because the complaint did not contain "factual allegations that specifically pertain to them – as distinct from those applicable to their corporate affiliates"); *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 1002 (N.D. Cal. 2009) (dismissing holding company because the complaint "lump[ed] together allegations against the holding company and its subsidiary").[19]  Because the complaint

---

[19]     *See also West v. Bank of Am., N.A.*, No. 2:10-CV-1966, 2011 WL 2491295, at *2 (D. Nev. June 22, 2011) (granting Bank of America's motion to dismiss when complaint "merely (continued…)

does not contain any allegations that tie JPMC to the wrongdoing alleged in the complaint, Plaintiff's claims against JPMC should be dismissed.

<u>**CONCLUSION**</u>

For the foregoing reasons, the entire complaint should be dismissed with prejudice and without leave to amend. *See Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259-60 (3d Cir. 2014) (denying leave to amend because plaintiff could not cure the legal deficiencies of her claim).

Dated: June 17, 2015                           Respectfully submitted,


                                               /s/ Anthony Del Guercio
                                               Anthony Del Guercio
                                               PARKER IBRAHIM & BERG LLC
                                               270 Davidson Avenue
                                               Somerset, NJ 08873
                                               (908) 725-9700


                                               Robert D. Wick
                                               Christian J. Pistilli
                                               Kathryn Cahoy
                                               COVINGTON & BURLING LLP
                                               One CityCenter, 850 Tenth Street, NW
                                               Washington, DC 20001-4956
                                               (202) 662-6000


                                               *Attorneys for Defendants*

---

state[d] that *defendants* committed the alleged wrongful actions, but fail[ed] to distinguish between the defendants and their actions"); *Gillespie v. HSBC N. Am. Holdings, Inc*., No. 05-cv-362, 2006 WL 2735135, at *5 (M.D. Fla. Sept. 25, 2006) (granting HSBC North America's motion to dismiss because the plaintiff "has not made any allegations against HSBC North America other than to aver that it is the parent company of HSBC Nevada"); *see generally United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation … is not liable for the acts of its subsidiaries." (internal quotation marks omitted)).