# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GINNINE FRIED, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>JPMORGAN CHASE & CO., and JPMORGAN CHASE BANK, N.A. d/b/a CHASE,<br><br>    Defendants. | Civil Action No.: 15-2512(MCA)(JBC) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DISMISS BY DEFENDANTS JPMORGAN CHASE & CO. AND JPMORGAN CHASE BANK, N.A.

James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO**
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Antonio Vozzolo
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Floor
New York, NY 10017
(212) 983-9330

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................................... 4

III.    LEGAL ARGUMENT ............................................................................................. 6

        A.      Standards Applicable To This Motion ...................................................... 6

        B.      Chase Improperly Calculated the PMI Termination Date ...................... 7

                1.      The Purpose of the HPA ................................................................. 7

                2.      The HPA Requires the Automatic Termination of PMI when
                        Borrowers' Loan Balance Drops Below 78% of the "Original Value." ..... 8

                3.      The Legislative History Illustrates That Termination Date of PMI for
                        Loan Modifications Is Based on "Original Value" ................................. 10

                4.      Fannie Mae and Freddie Mac Guidelines are Inapplicable to the HPA ... 12

        C.      Plaintiff's HPA Claim Is Not Time Barred ............................................. 14

        D.      Plaintiff's State Law Claims Are Not Preempted .................................. 18

        E.      Plaintiff Properly Pleads Each Element Of Her State Law Claims ...................... 20

                1.      Plaintiff Has Stated A Claim for Violation of the NJCFA ...................... 20

                2.      Plaintiff Has Stated A Claim For Breach Of Contract And Breach Of
                        The Implied Covenant Of Good Faith And Fair Dealing ........................ 23

                3.      Plaintiff Has Stated a Claim for Unjust Enrichment ............................... 25

                4.      Plaintiff Has Stated a Claim under the TCCWNA ................................. 27

        F.      Plaintiff Has Stated a Claim against JPMC ........................................... 27

IV.     CONCLUSION ...................................................................................................... 28

i

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Agostino v. Quest Diagnostics, Inc.*,
  2011 U.S. Dist. LEXIS 127904 (D.N.J. Nov. 3, 2011)............................................26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................6

*Bruesewitz v. Wyeth Inc.*,
  561 F.3d 233 (3d Cir. 2009)...........................................................................19

*Budzash v. Howell Twp.*,
  451 F. App'x 106 (3d Cir. 2011) ....................................................................14

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992)..............................................................18, 23, 24, 25

*City of Pittsburgh v. W. Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998)..............................................................................6

*Coulibaly v. J.P. Morgan Chase Bank, N.A.*,
  2011 U.S. Dist. LEXIS 87495 (D. Md. Aug. 8, 2011) .........................11, 12, 13, 26

*Cox v. Sears Roebuck & Co.*,
  138 N.J. 2 (1994) ...........................................................................................21

*Days Inn Worldwide, Inc. v. Tajj Assocs., LLC*,
  2015 U.S. Dist. LEXIS 102003 (D.N.J. Aug. 4, 2015)....................................24

*Del. State College v. Ricks*,
  449 U.S. 250 (1980)........................................................................................17

*DiBlasio v. Novello*,
  344 F.3d 292 (2d Cir. 2003)...........................................................................26

*Dobroshi v. Bank of Am., N.A.*,
  65 A.D.3d 882 (N.Y. App. Div. 2009) ...........................................................26

*Dwoskin v. Bank of Am., N.A.*,
  850 F. Supp. 2d 557 (D. Md. 2012)..................................................19, 22, 23

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  2015 U.S. Dist. LEXIS 61516 (S.D.N.Y. May 11, 2015)...............................22

ii

*Fellows v. CitiMortgage, Inc.*,
   710 F. Supp. 2d 385 (S.D.N.Y. 2010) ..................................................................19, 24, 25

*Gennari v. Weichert Co. Realtors*,
   148 N.J. 582 (1997) ........................................................................................................20

*Government of the Virgin Islands v. Knight*,
   989 F.2d 619 (3d Cir. 1993) ..........................................................................................8, 9

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985) ........................................................................................................18

*Holk v. Snapple Bev. Corp.*,
   575 F.3d 329 (3d Cir. 2009) ...........................................................................................18

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ........................................................................................................11

*Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merk & Co., Inc.*,
   192 N.J. 372 (2007) ........................................................................................................20

*Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*,
   2007 U.S. LEXIS 18113 (3d. Cir. July 27, 2007) ..........................................................27

*In re Kasbee*,
   466 B.R. 719 (W.D. Pa. 2010) ....................................................................................4, 22

*Klein v. Budget Rent a Car Sys., Inc.*,
   2013 U.S. Dist. LEXIS 58403 (D.N.J. Apr. 24, 2013) ...................................................20

*Kugler v. Romain*,
   58 N.J. 522 (1971) ..........................................................................................................21

*Kuzian v. Electrolux Home Prods., Inc.*,
   937 F. Supp. 2d 599 (D.N.J. 2013) ................................................................................21

*Lee v. Ashcroft*,
   368 F.3d 218 (3d Cir. 2004) ..........................................................................................9, 11

*Lemelledo v. Benefit Mgmt. Corp. of Am. and Beneficial N.J., Inc.*,
   150 N.J. 255 (1997) ........................................................................................................21

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ...................................................................................................18, 19

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010) ...................................................................................................15, 16

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008)............................................................6, 28

*Premium Mortg. Corp. v. Equifax, Inc.*,
  583 F.3d 103 (2d Cir. 2009).................................................................23

*In re Robb*,
  2008 Bankr. LEXIS 1680 (Bankr. S.D. Ohio June 10, 2008)................22

*Roth v. Norfalco LLC*,
  651 F.3d 367 (3d Cir. 2011).................................................................19

*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014)...........................................................14, 17

*Scott v. GMAC Mortg., LLC*,
  2010 U.S. Dist. LEXIS 88113 (W.D. Va. Aug. 25, 2010).....................4, 19, 22, 23

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)..............................................................................13

*Stewart v. Beam Global Spirits & Wine, Inc.*,
  877 F. Supp. 2d 192 (D.N.J. 2012)..................................................25, 26

*Suber v. Kontinental Koaches, Inc.*,
  104 F.3d 578 (3d Cir. 1997).................................................................21

*In re Thomas*,
  344 B.R. 386 (Bankr. W.D. Pa. 2006) .................................................22

*In re TMI Metro. Edison Co.*,
  67 F.3d 1119 (3d Cir. 1995)...................................................................9

*Treasurer of New Jersey v. U.S. Dep't of Treasury*,
  684 F.3d 382 (3d Cir. 2012).................................................................18

*Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*,
  139 N.J. 392 (1995) .............................................................................21

*Van Buskirk v. Carey Canadian Mines, Ltd.*,
  760 F.2d 481 (3d Cir. 1985).................................................................14

*VRG Corp. v. GKN Realty Corp.*,
  135 N.J. 539 (1994) .............................................................................25

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971), *reh'g denied*, 401 U.S. 1015 (1971)...................17

**Statutes**

12 U.S.C. § 4901 ............................................................................................. *passim*

12 U.S.C. § 4902 ............................................................................................. *passim*

12 U.S.C. § 4903 ............................................................................................. 2, 17

12 U.S.C. § 4904 ............................................................................................. 15, 16, 17

12 U.S.C. § 4905 ............................................................................................. 2

12 U.S.C. § 4907(b) ......................................................................................... 4, 14, 15

12 U.S.C. § 4908 ............................................................................................. 4, 12, 19

12 U.S.C. § 4909(a)(4) .................................................................................... 12

12 U.S.C. § 5491(a) ........................................................................................ 12

Private Mortgage Insurance Technical Corrections and Clarification Act in 2000,
106 P.L. 569 ........................................................................................... *passim*

Homeowner's Protection Act ........................................................................ *passim*

New Jersey Consumer Fraud Act .................................................................. *passim*

New Jersey Truth-in-Consumer Contract, Warranty and Notice Act ............ 18, 27

**Other Authorities**

12 C.F.R § 226.20(a) ..................................................................................... 11

5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil
3d § 1357 (3d ed. 2007) ......................................................................... 6

146 Cong. Rec. 3578 (May 23, 2000) .......................................................... 3, 10, 13

*Homeowners Insurance Proctection Act*, H.R. Rep. No. 105-55 (1997) .......... *passim*

*Homeowners Protection Act*, S. Rep. No. 105-129 (1997) ............................ 1, 7, 8, 13

## I.      INTRODUCTION

Private mortgage insurance ("PMI") exists to enable middle-income borrowers and/or first-time buyers to purchase a home without the required 20 percent down payment.  Under traditional underwriting standards, once a borrower's loan balance falls below 80 percent, PMI is no longer necessary.  At that point "excessive PMI coverage does not benefit the homeowner, and provides little extra protection to a lender."  *Homeowners Protection Act*, S. Rep. No. 105-129 (1997) (available on Lexis at 105 S. Rpt. 129, at 3).  Nevertheless, prior to 1998, Congress found that 1 in 5 homeowners were required to unnecessarily maintain PMI coverage long after obtaining a 20 percent equity stake in their home.  *Id.*  Indeed, some homeowners were required to maintain PMI coverage for the entire life of the loan.  *Id.*  For example, PMI overpayments (by more than 250,000 homeowners) in 1997, totaled more than $16.25 million each month.  *Id.*; *Homeowners Insurance Proctection Act*, H.R. Rep. No. 105-55 (1997) (available on Lexis at 105 H. Rpt. 55, at 5).  Notably, since "the protections that PMI offers flow to parties [i.e., lenders] who are not paying for it, market discipline does not necessarily address this problem."  105 S. Rpt. 129, at 2-3.  Consequently, Congress enacted the Homeowners Protection Act of 1998 ("HPA"), 12 U.S.C. §§ 4901, *et seq.*, to provide three distinct protections and/or requirements with respect to PMI: (1) periodic notice provisions regarding PMI; (2) automatic termination of PMI; and (3) borrowers' right to request cancellation.  105 H. Rpt. 55, at 4.

Under the termination provisions of the HPA applicable to this motion, PMI for a fixed rate mortgage, like Plaintiff's, must be automatically terminated on "the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the ***original value*** of the property securing the loan[.]" ("Termination Date"), 12 U.S.C. § 4901(18), (emphasis added).  The HPA defines "original

value" as "the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage was consummated" ("Original Value"), 12 U.S.C. § 4901(12). The HPA further provides that if the borrower is not current on the loan as of the "Termination Date," PMI automatically terminates on the first day of the first month beginning after the date that the borrower becomes current on the loan. 12 U.S.C. § 4902(b)(2). As explained by the Consumer Financial Protection Bureau ("CFPB"):

> If these conditions are met [i.e., once termination date is reached and payments are current], ***automatic termination of PMI is required even if the current value of the property has declined below the original value***. Because current value is not a factor in determining the "termination date," servicers may not require a borrower to pay for a property valuation as a condition of automatic termination of PMI.

CFPB Bulletin 2015-03 at 3 (Aug. 4, 2015) (emphasis added)[1]

Despite these clear pronouncements, Chase has engaged in a scheme to conflate loan modification concepts, including "original value" and the automatic "termination date" applicable to loan modifications with those for loan refinancing in order to require Plaintiff and similarly-situated borrowers to continue paying Chase PMI for years after the HPA requires termination of PMI. In Plaintiff's case, this amounts to over 12 years of PMI after Plaintiff's loan balance fell below 78% of the Original Value. ¶¶ 50, 52.[2]

Moreover, in order to eliminate ambiguities in the HPA (including those with respect to modifications), Congress enacted the Private Mortgage Insurance Technical Corrections and

---

[1]     Declaration Of Lindsey H. Taylor, ("Taylor Dec.") Ex. A.  Also *available at* http://files.consumerfinance.gov/f/201508_cfpb_compliance-bulletin_private-mortgage-insurance-cancellation-and-termination.pdf (last visited Aug. 14, 2015).

[2]     All references herein to "¶" are to the corresponding paragraphs of Plaintiff's Complaint and Demand for Jury Trial ("Complaint"), filed on April 8, 2015 (ECF No. 1).

Clarification Act in 2000 ("Corrections Act"), 106 P.L. 569, *amending* 12 U.S.C. §§ 4901, 4902, 4903, 4905.  Specifically, the Corrections Act was passed to eliminate, *inter alia*, "uncertainty relating to the cancellation and termination of PMI for  . . . loans whose terms or rates are modified over the life of the loan."   146 Cong. Rec. H. 3578, at 3579 (May 23, 2000).  In doing so, 12 U.S.C. § 4902(d) was enacted to provide that:

> If a mortgagor and mortgagee (or holder of the mortgage) agree[s] to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.

Contrary to Defendants' contentions, however, the legislature chose not to change either: (i) the method by which the Termination Date is calculated; or (ii) the definition of "Original Value" for purposes of calculating the PMI Termination Date for loan modifications.  In contrast, the Corrections Act **did** amend the definition for "Original Value" as it applies to loan refinance transactions to mean "only the appraised value relied upon by the mortgagee to approve the refinance transaction," **but made no such change with respect to loan modifications**.  12 U.S.C. § 4901(12); 146 Cong. Rec. H. 3578, at 3579.

Nevertheless, Chase argues that it is entitled to calculate the Termination Date of PMI based upon the value of the home at the time of the modification, rather than the "Original Value", claiming that it is one of the "terms and conditions" of the modification.  The "Original Value" upon which the Termination Date is based, however, is the lower "of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage was consummated." 12 U.S.C. § 4901(12).  At the time of modification, there was no change to the sales price of the home (since it was purchased four years earlier) no new mortgage was "consummated" (since the original loan was simply modified), nor was an appraisal conducted.  Instead, Chase commissioned a Broker's Price

3

Opinion ("BPO"), obtained at the time of modification to justify a $133,330.00 depreciation in value of Plaintiff's home. ¶¶ 47, 54. Since a BPO is less detailed and less accurate than an appraisal, it is typically not relied upon by a court to establish anything other than a rough value and is referred to as a mere "drive-by." *See In re Kasbee*, 466 B.R. 719, 726 (W.D. Pa. 2010). Therefore, the BPO value obtained by Chase at the time Plaintiff's mortgage was modified was improper for purposes of calculating the PMI Termination Date.[3]

Accordingly, based on the statutory definition of Original Value, and pursuant to the amortization schedule provided in the Modification Agreement, Plaintiff's loan balance was less than 78% of the Original Value in or about July 2014 at which point PMI on Plaintiff's loan should have been terminated. ¶ 50. Chase, however, has continued to collect PMI beyond the Termination Date and in violation of the HPA. At a minimum, this action was filed within nine months of Chase's violation of the HPA provisions with respect to termination of PMI and is therefore timely under the provisions of 12 U.S.C. § 4907(b).

In addition, Plaintiff's state law claims are "distinct and beyond the objectives of the HPA," and are therefore not pre-empted by 12 U.S.C. § 4908. *See Scott v. GMAC Mortg., LLC*, 2010 U.S. Dist. LEXIS 88113, at *15 (W.D. Va. Aug. 25, 2010). Finally, as detailed below, each of Plaintiff's state law claims properly state a cause of action.[4] Therefore, Plaintiff respectfully requests that Defendants' motion to dismiss be denied in its entirety.

## II. STATEMENT OF FACTS

The facts applicable to this motion are really quite simple. Plaintiff entered into a mortgage loan agreement to secure the purchase of her home on April 25, 2007. The loan was

---

[3] Chase's desire to change the express terms of the statute to apply either a different calculation of termination dates or the definition of "Original Value" should be addressed to the legislature, not to this Court.

[4] Plaintiff withdraws her state law claims for negligent misrepresentation.

for $497,950.00 plus interest, at a fixed yearly rate of 6.250%.  The sales price of the property was $553,330.00, and the appraisal value was $570,000.00.  ¶ 47.  Thus, by the HPA definition (12 U.S.C. § 4901(12)), the Original Value of Plaintiff's home is $553,330.00, and 78% of the Original Value is $431,597.40.  ¶ 47.  On January 10, 2011, Plaintiff Fried entered into a Home Affordable Modification Agreement with Chase ("Modification Agreement").  According to the terms of the Modification Agreement, effective February 1, 2011, the new principal balance was $463,736.98.  ¶ 49.  This modification was based upon a BPO rather than a new appraisal.  ¶ 54. The amortization schedule for the Modification Agreement shows the principal balance was scheduled to reach $431,314.42, or less than 78% of the Original Value, in July 2014.  ¶ 50.

Although the amortization schedule provided by the Modification Agreement indicated that the principal balance of Plaintiff's mortgage was below 78% of the Original Value in July 2014, Chase informed Plaintiff that PMI would be required until November 2026 – 148 months later.  ¶¶ 52-54.   Plaintiff sent numerous letters to Chase diligently seeking the basis for the calculation of the Termination Date PMI following her modification.  ¶¶ 52-54.  For the first time, on October 4, 2013, Chase informed Plaintiff that the Termination Date was based on a BPO performed in connection with her loan modification.  ¶ 54.[5]  Until receipt of this information, on October 4, 2013, Plaintiff did not know the basis for Chase's calculation of the Termination Date, and thus could not have discovered Chase's violations of HPA.

---

[5]      If necessary, Plaintiff asks leave to amend her complaint to demonstrate that Chase sent a letter dated October 2, 2013 that Chase was "still pending receipt of additional documentation that has been requested.  Until these are received we are unable to resolve your inquiry."

### III.    LEGAL ARGUMENT

#### A.    Standards Applicable To This Motion

On a motion to dismiss a complaint under Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).  At this stage, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted) (internal quotation marks omitted).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal quotation marks omitted).  "The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus:  stating … a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citations omitted) (internal quotation marks omitted).[6]

---

[6]    The *Twombly* court was clear, however, that this is not intended to be an onerous or even a heightened requirement, explaining that it "comports with [the] Court's statements in the years since [1957]." *Twombly*, 550 U.S. at 563 n.8.

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998); *see also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 3d § 1357 (3d ed. 2007).

**B.      Chase Improperly Calculated the PMI Termination Date**

**1.      The Purpose of the HPA**

Under traditional residential mortgage underwriting principles, lenders require a minimum 20 percent down payment when purchasing a home. This down payment provides a homeowner with a 20 percent equity stake in the home, discouraging a borrower from defaulting. Moreover, in the event of a default, the 20 percent down payment enables the lender to recover costs associated with the resale of a foreclosed property as well as accrued interest payments or fixed costs, such as taxes or insurance policies, paid prior to resale. Many middle-class and/or first-time homebuyers are unable to make a 20 percent down payment. When a potential homebuyer is unable to put 20 percent down, a lender, like Chase, will require PMI, a form of insurance that protects lenders against a mortgage default risk. Thus, PMI serves a very useful purpose by enabling middle-income borrowers or first time buyers to purchase a home without 20 percent down-payment who otherwise would not be able to purchase a home.

Lenders typically require PMI to insure the initial 20 percent of the loan value against loss. Importantly, PMI, only insures a lender up to the first 20 percent of the mortgage in the event a borrower defaults. Consequently, once a borrower's loan balance falls below 80% of the value of the home – whether by paying down the loan balance or by appreciation in the value of the home – PMI is no longer necessary. At that point "excessive PMI coverage does not benefit the homeowner, and provides little extra protection to a lender." S. Rep. No. 105-129 (1997)

7

(available on Lexis at 105 S. Rpt. 129, at 3).  Nevertheless, prior to 1998, Congress found that 1 in 5 homeowners were required to unnecessarily pay such PMI long after they had obtained a 20 percent equity stake in their home.  *Id.*  These payments by more than 250,000 homeowners totaled more than $16.5 million in overpayments each month in 1997.  *Id.*; H.R. Rep. No. 105-55 (1997) (available on Lexis at 105 H. Rpt. 55, at 5).

Notably, since "the protections that PMI offers flow to parties [i.e., lenders] who are not paying for it, market discipline does not necessarily address this problem."  105 S. Rpt. 129, at 2-3.  In order to clarify the point at which PMI should terminate, Congress enacted the HPA, 12 U.S.C. §§ 4901, *et seq.*, to provide three distinct requirements with respect to PMI:

> ***First***, it requires mortgage lenders and servicers to ***disclose*** to borrowers if PMI is required and, if so, how borrowers can terminate it. These notices are required at the time of settlement and annually while PMI is required. ***Second***, the bill provides for a statutory ***right for borrowers to terminate PMI*** once the conditions disclosed under the above-required notices are met. ***Third***, the bill provides for ***automatic termination of PMI*** once the loan reaches a [78%] LTV and if the borrower is current on payments.

105 H. Rpt. 55, at 4 (emphasis added).

Accordingly, Congress enacted the HPA to address the apparent problem of continued but unnecessary PMI coverage where a borrower's equity in her home exceeded the mandatory minimum.

### 2.    The HPA Requires the Automatic Termination of PMI when Borrowers' Loan Balance Drops Below 78% of the "Original Value."

Pursuant to the HPA, PMI for a fixed rate mortgage, like Plaintiff's, must automatically terminate on "the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the ***original value*** of the property securing the loan."   12 U.S.C. § 4901(18)(A) (emphasis added). In turn, the HPA defines

"original value" as "the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage was consummated."  12 U.S.C. § 4901(12).

When analyzing the legislative intent of a statute, "[i]t is axiomatic that statutory interpretation begins with the language of the statute itself."  *Government of the Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993) (citing *Pa. Dep't. of Pub. Welfare v. Davenport*, 495 U.S. 552, 557-58 (1990)).  Moreover, "if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive."  *In re TMI Metro. Edison Co.*, 67 F.3d 1119, 1123 (3d Cir. 1995).  Additionally, courts adopt a construction which recognizes each element of the statute.  *Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004).

Accordingly, under the unambiguous language and plain meaning of the HPA, Plaintiff's PMI should have terminated when her loan balance, as determined under the terms and conditions of the modification, i.e., the interest rate, payment schedule and amortization schedule, fell below 78% of the "Original Value" of her home.  Since Plaintiff received a loan modification in 2011, the terms and conditions of that modification (*i.e.*, the interest rate, payment schedule and amortization schedule), necessarily dictate when Plaintiff's loan balance would be less than 78% of the "Original Value" when the mortgage was consummated in 2007.  Pursuant to the interest rate, payment schedule and amortization schedule provided by the loan modification, Plaintiff's loan balance was scheduled to fall below 78% of the "Original Value" in July of 2014.  At that time, Plaintiff's PMI was statutorily required to terminate.

Notwithstanding the foregoing, Chase argues that the PMI Termination Date should not be calculated based upon the common sense meaning of Original Value, i.e., the lesser of the purchase price or the appraised value at the time the mortgage was consummated.  Rather, Chase

claims the calculation of the Termination Date should be based solely upon the purported value of Plaintiff's home at the time of the modification – as established solely by a drive-by BPO – "to reflect the modified terms and conditions of such loan."   Def. Br. at 5.   However, Chase's flawed logic flies in the face of the legislative intent of the HPA.   There is simply no common sense way to argue that the loan modification altered the Original Value of Plaintiff's home as defined by the HPA. First, the loan modification did not alter the "sales price of the property" since Plaintiff's home was not re-purchased nor refinanced.   Second, the loan modification could not have altered the appraised value of Plaintiff's home when the mortgage was consummated in 2007.   Thus, the only "terms and conditions" that Chase should have considered in recalculating the Termination Date were the principal balance, the interest rate, Plaintiff's payments and the amortization schedule.

### 3. The Legislative History Illustrates That Termination Date of PMI for Loan Modifications Is Based on "Original Value"

As previously discussed, the HPA was enacted by Congress in 1998 as a consumer protection statute.   In 2000, the Corrections Act was passed to eliminate, *inter alia*, "uncertainty relating to the cancellation and termination of PMI for  . . . loans whose terms or rates are modified over the life of the loan."   146 Cong. Rec. H. 3578, at 3579. To achieve this goal, the Corrections Act added subparagraph 12 U.S.C. § 4902(d), which states:

> Treatment of loan modifications. If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.

> Significantly, the aforementioned provision does not indicate that an appraisal value or BPO obtained for a loan modification should be substituted for the Original Value when calculating the date on which PMI should terminate.   Indeed, the Corrections Act amended the

definition of Original Value with respect to refinance transactions **but not with respect to modifications**:

> In the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction.

146 Cong. Rec. H. 3578, at 3579.

As explained by the Supreme Court, where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (internal quotation marks omitted). This principle of statutory construction "has special force when Congress has targeted specific problems with specific solutions in the context of a general statute." *Lee v. Ashcroft*, 368 F.3d at 223 (quoting *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 155 (3d Cir. 1999)). Moreover, it applies "'particularly when the two [provisions] are interrelated and closely positioned, both in fact being parts of the same statutory scheme.'" *Id.* Here, the Corrections Act specifically provides that the PMI Termination Date for a loan refinance transaction is based on the appraised value as opposed to the Original Value. This is because a loan refinance involves cancelling the initial loan and substituting it with a new one, whereas a loan modification simply changes the payment terms of an existing loan.[7] For all intents and purposes, Plaintiff's initial mortgage, together with the Original Value of her home upon which her initial mortgage was based, still existed. The construction of the HPA offered by Chase attempts to conflate loan refinancing concepts with loan modification concepts in order to force borrowers to pay for PMI coverage long after it should be terminated due to substantially lower purported home values.

---

[7]     *See* 12 C.F.R § 226.20(a), Federal Reserve Official Staff Commentary.

4.      **Fannie Mae and Freddie Mac Guidelines are Inapplicable to the HPA**

Chase mistakenly insists that Fannie Mae and Freddie Mac guidelines are relevant to the interpretation of HPA because of Fannie Mae's "enormous influence over the residential mortgage market."  Def. Br. at 3.  *See Coulibaly v. J.P. Morgan Chase Bank, N.A.*, 2011 U.S. Dist. LEXIS 87495, at *43-44 (D. Md. Aug. 8, 2011).  These guidelines, however, are irrelevant to the analysis of the HPA.

First, the HPA expressly provides "[t]he provisions of this [chapter] shall supersede any conflicting provision contained in any agreement relating to the servicing of a residential mortgage loan entered into by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any private investor or note holder (or any successors thereto)." 12 U.S.C. § 4908(b).  Consequently, any provision of the Fannie Mae guidelines that conflict with the provisions of the HPA are expressly superseded.

Second, Defendants' argument is contradicted by a recent pronouncement by the CFPB[8] (one of the governmental agencies authorized to enforce the HPA pursuant to 12 U.S.C. § 4909(a)(4)) repudiates Defendants' position.  Specifically, the CFPB recently issued CFPB Bulletin 2015-03 titled, "Compliance Bulletin: Private Mortgage Insurance Cancellation and Termination," Aug. 4, 2015 ("CFPB Bulletin"), which expressly states that Fannie Mae and Freddie Mac Guidelines cannot restrict Plaintiff's PMI termination rights in any fashion:

> Many mortgage loans are owned by Government-Sponsored Enterprises, or GSEs, such as Fannie Mae or Freddie Mac. These and other loan investors often create their own internal PMI cancellation guidelines that may include PMI cancellation provisions beyond those that the HPA provides.

---

[8]      CFPB is an independent agency in the Federal Reserve System, and tasked the agency with "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a).

> The CFPB cautions servicers to implement investor guidelines in a way that does not lead them to violate consumer financial law. Both the HPA and some investor requirements contain similar LTV thresholds for PMI cancellation and termination, and use similar measures of the property's value. Servicers should nonetheless remember that investor guidelines cannot *restrict* the PMI cancellation and termination rights that the HPA provides to borrowers.

*Id.* at 5.

As an agency charged with enforcing the HPA, the enforcement bulletins promulgated by the CFPB "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Furthermore, the Bulletin does not provide new guidance, but rather "summarize[d] existing requirements and does not establish any new or revise any existing recordkeeping, reporting, or disclosure requirements." CFPB Bulletin at 6.

Third, at the request of lenders such as Chase, the legislature intentionally did not set up a regulatory body with authority to promulgate interpretations or regulations under the HPA. *See* 105 H. Rpt. 55, at 5; 105 S. Rpt. 129, at 7. Indeed, the failure to establish such a regulatory authority made it necessary for the legislature to pass the Corrections Act. As explained by Congressman Vento, "Unfortunately, when we passed the Homeowner's Protection Act, we were unable to prevail on one issue, and that was to actually have a regulator to work out some of the details of the statute and the underlying policy. That has left us with the need to clarify some smaller points in the statute, as is being proposed in this bill before the House of Representatives today." 146 Cong. Rec. H. 3578, at 3581.

Lastly, as admitted by Chase, Fannie Mae and Freddie Mac are private entities that are in conservatorship. The mere fact that they are under the conservatorship of the Federal Housing Finance Authority does not confer the power to promulgate guidelines conflicting with the HPA. Consequently, just as in *Coulibaly*, 2011 U.S. Dist. LEXIS 87495, at *43-44, "[l]acking any

allegation that the Servicing Guide imposed contractual duties between Chase and Plaintiffs, this 'guidelines' discussion is superfluous."  Since Chase has not argued the guidelines imposed contractual duties between the parties, these guidelines are inapplicable and irrelevant to this motion.  To the extent Chase is concerned about its responsibilities or liabilities under the Fannie Mae guidelines solely as a servicer of Fannie Mae loans, 12 U.S.C. § 4907(c)(1) shields Chase as a servicer by providing: "the failure of a servicer to comply with the requirements of this [chapter] due to the failure of a mortgage insurer or a mortgagee to comply with the requirements of this [chapter], shall not be construed to be a violation of this [chapter] by the servicer."

### C.      Plaintiff's HPA Claim Is Not Time Barred

The statute of limitations is not an appropriate ground for a motion to dismiss brought pursuant to Rule 12(b)(6) and is appropriate *only* "where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."  *Budzash v. Howell Twp.*, 451 F. App'x 106, 109 (3d Cir. 2011) (internal quotation marks omitted); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  Moreover, "[s]ince the applicability of the statute of limitations usually involves questions of fact for the jury, defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred."  *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985).  Defendants fail to meet this burden.

Defendants claim the relevant statutes of limitation began to run in 2012 because she purportedly discovered Chase's violation when she received a letter indicating that her PMI "was scheduled to automatically cancel on November 1, 2026." Def. Br. at 20-21 (internal quotation marks omitted).  Defendant's arguments fail for a number of reasons.  First, Plaintiff submits that issues of inquiry notice and due diligence are highly factual and are not proper grounds for dismissal under Rule 12(b)(6).  Second, Defendants distort the allegations in the Complaint to

14

feign that Plaintiff was on notice of the improper conduct.  Rather, the Complaint alleges that for the first time, on October 4, 2013, Chase informed Plaintiff that the Termination Date was based upon a BPO performed in connection with her loan modification, arguably satisfying its disclosure obligations under 12 U.S.C. § 4904(b)(1).  ¶ 54.[9]  Until receipt of this information, on October 4, 2013, Plaintiff did not know the "grounds relied upon to make the determination," and could not have discovered Chase's violations of HPA.  Accordingly, Defendants' argument is unavailing.

The HPA provides: "No action may be brought by a mortgagor under subsection (a) [of this section] later than 2 years after the date of the discovery of the violation that is the subject of the action."  12 U.S.C. § 4907(b).  As acknowledged by Chase, this statute of limitations is analogous to the federal securities laws under which the statute of limitations "does not begin to run until 'discovery of the facts constituting the violation.'"  *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (quoting 28 U.S.C. § 1658(b)(1)).  In *Merck*, relied upon by Chase, the defendant argued, among others, that the plaintiffs were on "inquiry notice" based on events that predated the critical date for timeliness.  *Id.* at 650.  Defendant also argued that the plaintiffs discovered or should have discovered the facts constituting the violation when 1) the Food and Drug Administration (the "FDA") issued a warning letter, which said the company's marketing was false and misleading, and 2) product-liability lawsuits against the defendant were filed.  *Id.* at 653.  The court rejected both arguments.  Specifically, the court found that facts that would put a plaintiff on "inquiry notice" is insufficient to trigger the limitations period.  Instead the court held:

_____

> [T]he limitations period . . . begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have "discover[ed] the facts constituting the violation"--whichever comes first. In determining the time at which "discovery" of those "facts" occurred, terms such as "inquiry notice" and "storm warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered "the facts constituting the violation," including scienter--irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

*Id.* at 653. The Court also found that neither of the events (*e.g.*, FDA warning letter and subsequent lawsuits) that Merck relied upon constituted "'facts' indicating scienter" thus the plaintiff did not discover nor could a reasonably diligent plaintiff discover "the facts constituting the violation." *Id.* (internal quotation marks omitted). Just as in *Merck*, Plaintiff may have been put on inquiry notice when she discovered that Chase had extended the Termination Date by 148 months as a result of the Modification Agreement no later than October 10, 2012. ¶ 53; Def. Br. at 21. However, the limitations period did not begin to run until Plaintiff discovered the "grounds relied upon [by Chase] to make the determination" that her mortgage did not qualify for a cancellation or termination of PMI.[10] Like a reasonably diligent plaintiff, Plaintiff Fried sent numerous letters to Chase diligently seeking the basis for the calculation of the Termination Date PMI following her modification. ¶¶ 52-54. However, it was not until October 4, 2013 that Chase informed Plaintiff that the Termination Date was calculated based upon a lower value of her home determined by a BPO performed in connection with her loan modification. ¶ 54. The calculation based on a lower assessment instead of Plaintiff's Original Value resulted in an

---

[10]     The HPA provides:

> If a servicer determines that a mortgage did not meet the requirements for termination or cancellation of private mortgage insurance under subsection (a) or (b) of section 4902 of this title, the servicer shall provide written notice to the mortgagor of the grounds relied on to make the determination (including the results of any appraisal used to make the determination). 12 U.S.C. § 4904(b)(1)

artificial extension of the Termination Date.  Consequently, just as the plaintiffs in *Merck* could not have discovered the company's violations of the securities laws upon disclosure of the FDA warning letter or subsequent lawsuits against the defendant, Plaintiff Fried could not have discovered Chase's violation merely by its disclosures of the Termination Date prior to October 4, 2013.  Therefore, the limitations period on Plaintiff's claims did not begin to run until October 4, 2013.

Regardless, unless the claims contained in the Complaint initiating suit clearly appear to be time–barred on the face of the pleading, a defendant's statute of limitations defense should not be adjudicated by a federal district court until the summary judgment stage. *See Schmidt*, 770 F.3d at 249.

Additionally, the HPA was enacted to provide consumers with three distinct protections: (1) notice (12 U.S.C. § 4903); (2) automatic termination (12 U.S.C. § 4902(b)); and (3) right to cancellation (12 U.S.C. § 4902(a)).  105 H. Rpt. 55, at 4.  Therefore, even if the Court were to determine that the statute of limitations barred Plaintiff's disclosure violation claims, Chase's failure to terminate PMI in July 2014 and failure to give the termination notice within 30 days (12 U.S.C. § 4904(a)) constituted separate and distinct violations of the HPA for which Plaintiff timely filed her Complaint.  12 U.S.C. Section 4902(f)(1) requires the return of any premiums collected after termination within 45 days of the date of termination.  For claims that begin to run upon the occurrence of wrongful conduct, not discovery as with HPA, courts have held that plaintiffs are not barred from recovery for subsequent wrongful acts which occurred within the statute of limitations.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971), *reh'g denied*, 401 U.S. 1015 (1971) (antitrust); *Del. State College v. Ricks*, 449 U.S. 250, 257-58 (1980) (discrimination).  The failure to terminate Plaintiff's PMI in July 2014, the failure to give

17

the requisite notice of termination, and the failure to return premiums collected after the termination date constituted separate and distinct wrongful acts for which the Complaint was timely filed.

### D.   Plaintiff's State Law Claims Are Not Preempted

Chase argues that the preemption provision of the HPA precludes Plaintiff from bringing her breach of warranties and unjust enrichment claims, as well as violations of the New Jersey Consumer Fraud Act ("NJCFA") and New Jersey Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA").  Def. Br. at 21-24.  However, because Plaintiff's claims are premised on conduct that is separate and distinct from that which is regulated by the HPA, the claims are not preempted.

As a beginning point for preemption analysis, the Court must presume "that Congress does not cavalierly preempt state-law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  As explained by the Supreme Court, "'[i]n areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest.'" *Holk v. Snapple Bev. Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).  Consequently, any analysis of preemption begins with "[a] presumption against [ ] pre-emption." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992).  In applying this standard in the context of consumer protection laws traditionally regulated by the states, when "confronted with two plausible interpretations of a statute, [courts] "'have a duty to accept the reading that disfavors pre-emption.'" *Snapple*, 575 F.3d at 334 (quoting *Bates,* 544 U.S. at 449).

There are three forms of preemption: "express preemption and two types of implied preemption, field preemption and conflict preemption." *Treasurer of New Jersey v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir. 2012); *see also Hillsborough Cnty., Fla. v. Automated*

18

*Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).  Chase has argued that Plaintiff's claims are subject to express and conflict preemption.  In order to overcome the presumptions against such express preemption, "[t]he congressional enactment . . . must be explicit about its preemptive effects." *Roth v. Norfalco LLC*, 651 F.3d 367, 374 (3d Cir. 2011).  In other words, "the purpose of Congress is the ultimate touchstone in every pre-emption case."  *Medtronic*, 518 U.S. at 485 (internal quotation marks omitted).  Thus, courts must "examin[e] the 'plain wording of the clause,' as this 'necessarily contains the best evidence of Congress' pre-emptive intent.'" *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009) (quoting *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002)), *aff'd sub nom. Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011).  Even though an express preemption provision may suggest the preemption of at least some state law, courts must also "identify the domain expressly pre-empted by that language." *Medtronic*, 518 U.S. at 484 (internal quotation marks omitted).

In this case, Section 9 of the HPA reads in pertinent part:

the provisions of this [chapter] shall supersede any provisions of the law of any State relating to requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions, cancellation or automatic termination of such private mortgage insurance, any disclosure of information addressed by this [chapter], and any other matter specifically addressed by this [chapter].

12 U.S.C. § 4908(a)(1).

The mere fact that a complaint addresses PMI, or the termination thereof, does not automatically place it within "the domain [Congress] expressly preempted" by the HPA as Chase suggested.  Rather, courts have held that where state law "claims are altogether distinct and beyond the objectives of the HPA, . . . [they] fall outside the preemptive scope of the HPA." *Scott v. GMAC Mortg., LLC*, 2010 U.S. Dist. LEXIS 88113, at *15 (W.D. Va. Aug. 25, 2010); *see also Dwoskin v. Bank of Am., N.A.*, 850 F. Supp. 2d 557, 568 (D. Md. 2012) (state law claims

arising from "a separate duty" are not preempted by HPA); *Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 403 (S.D.N.Y. 2010) (breach of contract claim not preempted since it "is not predicated on any violation of state-imposed obligations").  As detailed below, each of Plaintiff's state law claims are separate and distinct from her claims under the HPA and arise from conduct that falls beyond the scope of the HPA.

### E.   Plaintiff Properly Pleads Each Element Of Her State Law Claims

### 1.   Plaintiff Has Stated A Claim for Violation of the NJCFA

Chase does not argue that Plaintiff inadequately alleged each required element of her claim under the NJCFA.  Instead, Chase argues that Plaintiff's claim under the NJCFA is 1) expressly preempted by the HPA and 2) Plaintiff is attempting to use this claim (and other state law claims) as an alternative means of enforcing the HPA.  Def. Br. at 21-24.   This argument is without merit as it misunderstands and mischaracterizes Plaintiff's claim.  The Complaint alleges that Chase engaged in the "unconscionable commercial practice" of using BPOs instead of the Original Value to extend its ability to collect PMI, in the case of Plaintiff for over 12 years and increased Plaintiff's payments by over $20,000.  ¶¶ 1, 4, 38-42, 50, 52, 103, 105. It is this separate and distinct conduct for which Plaintiff seeks to hold Chase accountable.

The NJCFA "imposes liability on any person who uses: 'any **unconscionable commercial practice**, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission.'"  *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merk & Co., Inc.*, 192 N.J. 372, 389 (2007) (emphasis added) (quoting N.J.S.A. § 56:8-2); *see also Klein v. Budget Rent a Car Sys., Inc.*, 2013 U.S. Dist. LEXIS 58403, at *8-9 (D.N.J. Apr. 24, 2013).   A violation of the NJCFA may arise from (i) an affirmative act; (2) a misrepresentation or omission; or (3) a violation of a law or administrative regulation.

*Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605 (1997).   Moreover, whereas here, the violation of the NJCFA consists of an affirmative act, as opposed to misrepresentations or omissions, it is unnecessary that the plaintiff prove the defendant intended to commit an unlawful act.   *Id.*   Furthermore, the NJCFA is "applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud."   *Lemelledo v. Benefit Mgmt. Corp. of Am. and Beneficial N.J., Inc.*, 150 N.J. 255, 264 (1997).

Plaintiff's claim under the NJCFA is ***not*** based upon the fact that Chase's actions are unlawful, *i.e.*, violate the HPA.   Nor are Plaintiff's claims based upon misrepresentations. Rather, Plaintiff claims Chase's conduct constitutes an unconscionable commercial practice. Indeed, the word unlawful does not appear in Plaintiff's Complaint, and the sixth cause of action for violation of the NJCFA does not even make reference to the HPA.

The New Jersey Supreme Court has held that for the purposes of the NJCFA that unconscionability is "an amorphous concept obviously designed to establish a broad business ethic."   *Kugler v. Romain*, 58 N.J. 522, 543 (1971).   In other words, the term "unconscionable" implies lack of "good faith, honesty in fact and observance of fair dealing."   *Id.* at 544; *see also Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994).   Such unconscionable conduct can arise even from a breach of contract and the plaintiff need only demonstrate that the business behavior in question "stand[s] outside the norm of reasonable business practice in that it will victimize the average consumer."   *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 416 (1995).   Under this standard, courts have found a broad range of conduct oto constitute unconscionable commercial practices coupled with sufficiently aggravating circumstances to constitute an unconscionable commercial practice in the absence of fraud.   *See, e.g., Suber v. Kontinental Koaches, Inc.*, 104 F.3d 578, 587 (3d Cir. 1997) (claim under the NJCFA could not

be dismissed as a matter of law where car manufacturer repeatedly denied existence of defects); *Kuzian v. Electrolux Home Prods., Inc.*, 937 F. Supp. 2d 599, 614 (D.N.J. 2013) (the selling of defective refrigerators which "Electrolux knowingly cannot repair, and refuses to replace" constituted an unconscionable commercial practice).

Separate and distinct from any claim that Chase's conduct violated the HPA, the Complaint alleges that Chase engaged in a scheme to improperly utilize BPOs performed at the time of the loan modification (and paid for by consumers) in place of the Original Value to extend PMI for up to 12 years or more.  ¶¶ 1, 4, 38-42, 50, 52, 103.  In fact, courts have found that BPOs by their very nature are so dubious that they are often referred to as "drive-by" or "drive-by appraisals," and only serve to give "a general idea of the value of the property."  *See e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 U.S. Dist. LEXIS 61516, at *78-79, and n. 14 (S.D.N.Y. May 11, 2015); *In re Robb*, 2008 Bankr. LEXIS 1680, at *12-13 (Bankr. S.D. Ohio June 10, 2008).  As a result, courts have generally found that "[f]ull appraisals, not just the 'drive-by' Broker's Price Opinion" should be used to determine the value of a real estate.  *See In re Kasbee*, 466 B.R. at 726; *In re Thomas*, 344 B.R. 386, 393 (Bankr. W.D. Pa. 2006).

Nevertheless, Chase engaged in the unconscionable practice of forcing consumers to pay for such drive-by BPOs and used the resulting value to extend PMI under the contract to collect $20,000 or more from consumers such as Plaintiff.  This unconscionable conduct constitutes a separate and distinct wrong for which Plaintiff is seeking recovery.

Thus, Plaintiff's claim is similar to those asserted by the plaintiffs in *Scott* and *Dwoksin*, and is not preempted by the HPA.  In *Scott*, the defendant bank asserted that the plaintiffs' claims were preempted by the HPA, but the court concluded the plaintiff's claims were

"altogether distinct and beyond the objectives of the HPA," and as such "[fell] outside the preemptive scope of the HPA." *Id.* 2010 U.S. Dist. LEXIS 88113, at *15. As the court explained, the "most relevant question for such an analysis is whether permitting Plaintiffs' common law fraud claims to proceed would confound Congress's objective in passing the HPA, that is, the creation and enforcement of a uniform set of regulations governing disclosure of mortgage insurance." *Id.* at *14. Here, Plaintiff's claim under the NJCFA does not threaten the structural integrity of the HPA. Like the fraud claims that the *Scott* plaintiffs pled, Plaintiff's claim is of general application to all commercial transactions. Furthermore, Plaintiff's claim neither enlarge nor reduce the requirements embodied in the HPA. Rather, Plaintiff seeks to prevent Chase from engaging in an unconscionable conduct that has deceived Plaintiff and similarly situated consumers.

Similarly, the defendant bank in *Dwoskin* contended that the plaintiff's common law claims and state law consumer protection claim were preempted by the HPA. *Id.* 850 F. Supp. 2d at 567. The court upheld each of these claims, explaining that the claims were not inconsistent with the HPA and did not interfere with the congressionally mandated regulatory scheme for PMI. *Id.* at 568-69. The *Dwoskin* court held, in line with the *Scott* decision, the claims for fraud and negligent misrepresentation stemmed from a duty separate from those imposed by the HPA. *Id.* at 568. Separately, the court also concluded, the state consumer protection claim "seek[s]… to enforce a general claim that a business cannot tell a customer one thing and then proceed to do another." *Id.* at 569.

### 2. Plaintiff Has Stated A Claim For Breach Of Contract And Breach Of The Implied Covenant Of Good Faith And Fair Dealing

For the purposes of preemption, the Supreme Court draws a distinction between a "contractual commitment voluntarily undertaken" and a "requirement . . . imposed under State

law." *Cipollone*, 505 U.S. at 525-26 (internal quotation marks omitted); *see also Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009). Specifically the Court explained "common understanding dictates that a contractual requirement, although only enforceable under state law, is not 'imposed' by the State, but rather is 'imposed' by the contracting party upon itself." *Cipollone*, 505 U.S. at 526 n.24; *see also Fellows*, 710 F. Supp. 2d at 403. Here, the breach of contract claim does not arise under state-imposed obligations, but by the voluntary assumption of liability by the parties under a mortgage agreement. Thus, Plaintiff's "breach of contract claim does not run afoul of the HPA's preemption provision or frustrate its purpose." *Fellows*, 710 F. Supp. 2d at 403-04.

Under New Jersey law, Plaintiff's breach of "contract claim has three elements: [1] a valid contract, [2] a breach of that contract by the defendant, and [3] damage to the plaintiff." *Days Inn Worldwide, Inc. v. Tajj Assocs., LLC*, 2015 U.S. Dist. LEXIS 102003, at *4-5 (D.N.J. Aug. 4, 2015). Chase argues that Plaintiff fails to plead a claim for either breach of contract or breach of the implied covenant of good faith and fair dealing solely because 1) the Complaint fails to allege Chase failed to perform its obligations under the contract and 2) the implied covenant of good faith and fair dealing does not give rise to an obligation to use the Original Value when recalculating the Termination Date. Def. Br. at 24-26. This argument is directly contrary to the express holding of *Fellows* and ignores the plain language of the contract between Plaintiff and Chase.

Specifically, Section 10 of Plaintiff's mortgage, just as in *Fellows*, "unambiguously states" that Plaintiff must pay premiums required to maintain mortgage insurance "until [Lender's] requirement for [PMI] ends according to any written agreement between Lender and Borrower providing for such termination or until termination is required by Applicable Law."

24

*Compare Fellows*, 710 F. Supp. 2d at 404 *with* Decl. of Christian J. Pistelli, Ex. A at 8 of 16 (ECF No. 10-2).  Here, Plaintiff is seeking to vindicate her right under the mortgage to the termination of PMI under the relevant applicable law.  As discussed above, PMI must be automatically terminated when the principal balance is first scheduled to reach 78 percent of the original value of the property securing the loan. *See* discussion *supra*, Part I. Not only did Chase fail to terminate PMI when that date came due, Chase improperly recalculated Plaintiff's PMI termination date based on a BPO obtained at the time of the loan modification in place of the Original Value.

In *Fellows*, the court ultimately held, though the breach of contract claim was not preempted, the plaintiff failed to state a claim for breach of contract.  Specifically, the plaintiff failed to "allege that he entered into a written agreement with CitiMortgage providing for termination of PMI, or that termination of PMI was required under any applicable law, ***including the HPA*** . . ." *Id.* at 404-05.  Unlike the plaintiff in *Fellows* who relied on Fannie Mae Servicing Guidelines that were not made part of the mortgage, Plaintiff specifically alleged that Chase continued to collect PMI after "termination of PMI was required under . . . applicable law." *Id.* at 405; *see* ¶¶ 49-54.  As such, Plaintiff has properly alleged Chase breached a "contractual commitment voluntarily undertaken" distinct from its violation of applicable law.  *Cipollone*, 505 U.S. at 526.  This breach is sufficient to support claims for both breach of contract and breach of implied covenant of good faith and fair dealing.

### 3.     Plaintiff Has Stated a Claim for Unjust Enrichment

As acknowledged by Chase, "[t]o establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994).  An unjust enrichment claim must "involve either some direct relationship between the parties or a mistake on the part

of the person conferring the benefit." *Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 196 (D.N.J. 2012) (quoting *Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 335 (N.J. 1966)). Contrary to Chase's argument, the Complaint properly alleges both elements of Plaintiff's unjust enrichment claim that involves "some direct relationship" with Chase.

First, the Complaint alleges that Chase collected premiums for PMI after termination was required by contract. ¶¶ 19-29, 48-54.[11]  The Complaint further alleges that Chase, as the lender under the mortgage, directly benefitted from the PMI.  ¶¶ 12-16.  Chase claims that it did not receive any benefit since "Plaintiff's PMI premiums are paid into escrow for the benefit of an 'unaffiliated third-party' insurance company."  Def. Br. at 26. (quoting ¶ 15).  This misunderstands both the law and the facts applicable to this claim.  In *Agostino v. Quest Diagnostics, Inc.*, a debt collector sought to avoid liability for unjust enrichment by asserting it was collecting money from consumers on behalf of the principal creditor.  *Id.* 2011 U.S. Dist. LEXIS 127904, at *28 (D.N.J. Nov. 3, 2011).  The *Agostino* court, under almost identical circumstances, rejected this argument and upheld unjust enrichment claim against the debt collector "to the extent that the [collector] retained any portion of the administrative fees for their successful collection[.]"  *Id.*  Whether or not Chase received any portion of the premiums for acting as escrow agent is an issue of fact that should be reserved for discovery and summary judgment. *See DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003) ("a disputed issue of fact [] is inappropriate to consider in the context of a Rule 12(b)(6) motion"). Furthermore, the *Stewart* court stated the requirement of "some direct relationship" is to limit recovery against an innocent defendant who has no course of dealings or demonstrated connection to the plaintiff. *Id.* 877 F. Supp. 2d at 200.  Unlike the defendant bank in *Dobroshi v. Bank of Am., N.A.*, it is indisputable

---

[11]     If the Court were to find that the Complaint does not sufficiently allege Chase collected the PMI premiums directly from Plaintiff, Plaintiff asks for leave to amend.

that Chase, as the lender, received the ultimate benefit of the PMI. *Compare* 65 A.D.3d 882, 885 (N.Y. App. Div. 2009) with ¶¶ 12-16.

Second, as detailed above, Chase obtained this benefit through the unconscionable commercial practice of using BPO to continue to collect PMI from consumers. As such it would be unjust to allow Chase to retain this benefit.

### 4.      Plaintiff Has Stated a Claim under the TCCWNA

As with Plaintiff's claim under NJCFA, Plaintiff's claim under TCCWNA is not preempted because Chase's unconscionable practice is separate and distinct from the claims that Plaintiff assert for violations of the HPA. *See* discussion *supra* Part III.E.1. Chase argues Plaintiff has failed to state a claim under the TCCWNA solely because she failed "'to identify a particular contract provision' that violates a clearly established right or responsibility." Def. Br. at 28 (quoting *Billings v. TD Bank, NA*, 2013 WL 3989572, at *5 (D.N.J. Aug. 1, 2013)). As detailed above, however, Plaintiff clearly demonstrated a violation of Section 10 of the Plaintiff's mortgage. *See* discussion *supra* Part III.E.2.

### F.      Plaintiff Has Stated a Claim against JPMC

Chase argues JPMC is nothing more than a holding company, and therefore cannot be held liable to the conduct of its subsidiary. Def. Br. at 29. In fact, however, the Complaint alleges that JPMC "provides investment banking, financial services for consumers and businesses, financial transaction processing, asset and wealth management and private equity services." ¶ 7. JPMC serves millions of customers in the United States under its J.P. Morgan and Chase brands, including Defendant JPMorgan Chase Bank, N.A, a national banking association with branches in 23 states. While a parent company is generally not liable for the acts of its subsidiary, the parent company "'may be held liable for the activities of its subsidiary based on an application of general agency principles.'" *Jurimex Kommerz Transit G.M.B.H. v.*

*Case Corp.*, 2007 U.S. LEXIS 18113, at *5 (3d. Cir. July 27, 2007) (quoting *Phoenix Can. Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988)). Under well-established law, on this motion, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 233 (internal quotation marks omitted). Thus, under the allegations of the Complaint, Plaintiff has alleged that JPMC provided financial services to consumers such as Plaintiff Fried, and that Defendant JPMorgan Chase Bank, N.A is a wholly owned subsidiary of JPMC that handles consumer and commercial banking businesses including home lending. ¶ 7-8. As set forth above and in the Complaint, Plaintiff details the wrongful actions taken by Defendants collectively. Such allegations, at the pleading stage, are sufficient to state a claim.

## IV.    CONCLUSION

For the foregoing reasons, Chase's Motion to Dismiss should be denied in its entirety.

> CARELLA, BYRNE, CECCHI
> OLSTEIN, BRODY & AGNELLO
> Attorneys for Plaintiff
>
> By:    /s/ James E. Cecchi
>         JAMES E. CECCHI

Dated: August 14, 2015

Antonio Vozzolo
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330

*Attorneys for Plaintiff*

28