<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **GINNIE FRIED, on behalf of herself and all others similarly situated,**<br><br>Plaintiff,<br><br>v.<br><br>**JPMORGAN CHASE & CO., et al.,**<br><br>Defendants. | Civil Action No. 15-2512 (MCA)<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.'s (collectively, "Defendants" or "Chase") motion to dismiss. Dkt. No. 10. Plaintiff Ginnie Fried ("Plaintiff"), on behalf of herself and all others similarly situated, opposes the motion. Dkt. No. 17. The Court has considered the motion without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Defendants' motion is **DENIED in part and GRANTED in part.**

**I.    BACKGROUND**

This class action arises out of Defendants' alleged miscalculation of the date ("termination date") on which it should have terminated Private Mortgage Insurance ("PMI") on residential mortgage transactions or loans that have been modified. Compl. ¶ 1, Dkt. No. 1. PMI is a type of extra insurance that lenders require from homebuyers who obtain loans that are more than 80% of their new home's value. Id. at ¶ 2. Typically, buyers with less than 20% down are normally required to purchase PMI. Id.

1

In 2007, Plaintiff purchased a home in Teaneck, New Jersey. Compl. ¶¶ 6, 47, Dkt. No. 1. She entered into a mortgage loan agreement with Chase to secure the purchase of her home for $497,950 plus interest, at a fixed yearly interest rate of 6.250%. Id. ¶ 47. At that time, the sales price of the property was $553,330, and the appraisal value was $570,000. Id.

Because the loan-to-value ratio exceeded 80%, Plaintiff was required to purchase PMI. Id. ¶¶ 47-48. As required by the Homeowner's Protection Act ("HPA"), Chase provided Plaintiff with a PMI disclosure stating PMI was scheduled to automatically terminate on March 1, 2016, the date on which the principal balance of the mortgage loan is first scheduled to reach 78% of the original value[1] of the property. Id. ¶ 48.

On or about January 10, 2011, Plaintiff obtained a modification of her loan ("Modification Agreement") through the federal Home Affordable Modification Program ("HAMP") with Chase. Id. ¶ 49. Under the terms of the Modification Agreement, the new principal balance was adjusted to $463,736.98. Id. The new amortization schedule for the Modification Agreement shows that the principal balance was scheduled to reach $431,314.42, or less than 78% of the original value, in July 2014. Id. ¶ 50. The Modification Agreement neither changed nor mentioned the original value of the loan. Id. ¶ 51.

Thereafter, Plaintiff contacted Chase to inquire about the cancellation and termination dates of the PMI on her loan. Id. ¶ 52. In response, on August 31, 2012, Chase informed Plaintiff that PMI was scheduled to automatically terminate on November 1, 2026. Id. Plaintiff questioned this calculation, and on October 10, 2012 and April 9, 2013, Chase sent additional letters to Plaintiff explaining that November 1, 2026 is "when the loan will reach 78% based on the modified

---

[1] As discussed infra, pursuant to 12 U.S.C. § 4901(12), the "original value" of the property is $553,330, the 2007 sales price of the property, and 78% of the "original value" is $431,597.40. Id. ¶ 47.

2

terms and conditions." Id. ¶ 53.  Plaintiff sent further inquiries to Chase.  Id. ¶ 54.  Finally, on October 4, 2013, Chase disclosed that in calculating the termination date, it had utilized a property value of $420,000, determined by a Broker's Price Opinion ("BPO") ordered during the loan modification review, as opposed to the original value from 2007, to determine the termination date. Id. ¶ 54.  The amortization schedule from the Modification Agreement shows that the principal balance on November 1, 2026 is scheduled to be less than $327,600 or 78% of the BPO value.  Id.

On April 8, 2015, Plaintiff filed a Complaint, on behalf of herself and all others similarly situated, against Defendants arising out of Defendants' collection and assessment of PMI on residential mortgage transactions or loans which have been modified.  Id. ¶ 1.  Plaintiff asserts the following counts in her Complaint:  (1) Violation of the HPA; (2) breach of contract; (3) breach of implied covenant of good faith and fair dealing; (4) unjust enrichment; (5) negligent misrepresentation; (6) violation of New Jersey Consumer Fraud Act ("NJCFA"); and (7) violation of New Jersey Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA").  On June 17, 2015, Defendants filed the instant motion to dismiss.[2]  Dkt. No. 10.

## II.   LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).  Dismissal is inappropriate even where "it appears

---

[2] Defendants attached two documents to their motion to dismiss—a copy of the Mortgage and the Modification Agreement.  See Declaration of Christian J. Pistilli ("Pistilli Decl."), Exs. A-B, Dkt. Nos. 10-3, 10-4.  A court "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).  Here, Plaintiff extensively relies on the contents of the Mortgage Note and Modification Agreement in her allegations.  Plaintiff does not dispute the authenticity of these documents.  As such, the Court will consider these documents in evaluating Defendants' motion.

3

unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. The facts alleged, however, must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### III. ANALYSIS

#### a. THE HOMEOWNERS PROTECTIONS ACT ("HPA") CLAIM

In 1998, Congress enacted the HPA to "establish Federal guidelines for disclosure and termination of private mortgage insurance (PMI)." H.R. Rep. No. 105-55, at 4 (1997). Although PMI was found to "play[] an important role in the mortgage industry by allowing low-income borrowers or borrowers with little cash greater access to home ownership," id. at 5, Congress determined that "homeowners are not always informed when PMI is required, and if it is, how it can be terminated." Id. at 6; see also S. Rep. 105-129, at 2-3 (1997), as reprinted in 1998 U.S.C.C.A.N. 313, 314-15. Legislation was therefore needed "to establish Federal standards for disclosure and termination of PMI so that borrowers do not pay for insurance after all parties in the mortgage process agree that such insurance is no longer necessary." H.R. Rep. No. 105-55, at 6. The HPA "creates a national standard for cancellation that is clear and simple for consumers to understand." 143 Cong Rec. S12410, S12414 (daily ed. Nov. 9, 1997) (statement of Sen. Faircloth).

The HPA extends to any residential mortgage loan transaction consummated on or after July 29, 1999, on a single-family dwelling that is the primary residence of the mortgagor. 12

U.S.C. § 4901(14), (15).  Pursuant to 12 U.S.C. § 4902(b)(1), PMI, in connection with a residential mortgage transaction, shall automatically terminate "on the termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction."  The "termination date" under the HPA is defined as

> (A) with respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and
>
> (B) with respect to an adjustable rate mortgage, the date on which the <u>principal balance of the mortgage</u>, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, <u>is first scheduled to reach 78 percent of the original value of the property securing the loan</u>.

12 U.S.C. § 4901(18) (emphasis added).  Accordingly, the basic formula for determining the automatic termination date of PMI requires utilizing the "principal balance of the mortgage" and the "original value" of the property.  See <u>Rice v. Green Tree Servicing, LLC</u>, No. 14-93, 2015 U.S. Dist. LEXIS 122566, at *12 (N.D. W. Va. Sept. 15, 2015).  The term "original value" is defined as:

> <u>the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage was consummated</u>. In the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction.

12 U.S.C. § 4901(12) (emphasis added).

The statute also specifically addresses the treatment of loan modifications.  Section 4902(d) provides that:

> If a mortgagor and mortgagee (or holder of the mortgage) <u>agree to</u> a modification of the terms or conditions of a loan pursuant to a

5

> residential mortgage transaction, the cancellation date, <u>termination date</u>, or final termination <u>shall be recalculated to reflect the modified terms and conditions of such loan</u>.

12 U.S.C. § 4902(d) (emphasis added).

Here, Defendants contend that the updated property value that it used to recalculate Plaintiff's PMI termination was a "condition" of the loan modification within the meaning of the HPA. According to Defendants, an updated property value is a "mandatory prerequisite" to modification and therefore always a "condition" to a loan modification. They argue this is compelled by the plain meaning of the statute and consistent with Treasury Department rules for loan modifications and Fannie Mae Servicing Guides. The Court disagrees.

"It is axiomatic that statutory interpretation begins with the language of the statute itself." <u>V.I. v. Knight</u>, 989 F.2d 619, 633 (3d Cir. 1993) (citing <u>Pennsylvania Dep't of Pub. Welfare v. Davenport</u>, 495 U.S. 552, 557-58 (1990)). Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive. <u>Id.</u> (citing <u>Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980)); <u>Abdul-Akbar v. McKelvie</u>, 239 F.3d 307, 313 (3d Cir. 2001).

The language of § 4902(d) of the HPA must be given its ordinary meaning. The language of the statute makes clear that the "terms and conditions" to be used are those that the mortgagor and mortgagee "<u>agree to</u>." Nothing in the statute indicates that an updated property value must always be a "term and condition" of the modification, or that an updated property value must be substituted for the "original value" when calculating the termination date of PMI.[3] Thus, an

---

[3] This interpretation is consistent with the overall statutory scheme of the HPA. In 2000, Congress passed the Private Mortgage Insurance Technical Corrections and Clarification Act (the "Corrections Act") to, <u>inter alia</u>, eliminate "uncertainty relating to the cancellation and termination

updated property value would only be a "term and condition" of the loan modification if the parties agreed to it. Determining whether the "terms and conditions" include the updated property value requires review of the facts underlying the agreement between the parties.[4]

The Treasury Department rules do not alter this conclusion. Defendants argue that it must obtain an updated property value in order to make a HAMP loan modification, so the updated property value is always a "condition" of the modification. For this proposition, they cite to Treasury Department rules, which require servicers to "obtain an assessment of the current value of the property securing the mortgage loan being evaluated for HAMP." See Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, § 6.8 "Property Valuation", at 73 (Version 3.0) (Dec. 2, 2010) ("MHA Handbook"), available at https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_30.pdf. However, the Treasury Department rules are not referenced anywhere in the HPA. Moreover,

---

of PMI . . . for loans whose terms or rates are modified over the life of the loan." 146 Cong. Rec. H. 3578, at 3579. Congress made several amendments to the HPA. First, Congress added § 4902(d), a new subsection to specifically address loan modifications. It also amended the definition of "original value," with respect to refinance transactions: "[i]n the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction." 12 U.S.C. § 4901(12) (emphasis added). "[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 (1987) (internal citation omitted). Here, the Corrections Act specifically provides that the PMI termination for a loan refinance is based on the new appraisal price as opposed to the value established when the loan was originally consummated. It makes no such reference to loan modifications in this section but did add an entire provision on loan modifications in another section. Thus, it is presumed that Congress acted intentionally when it did not add a new definition for loan modifications under the "original value" section.

[4] Defendants do not point to any evidence in the record—from the Complaint or Modification Agreement—showing that the parties agreed to the updated property value becoming a "term and condition" of the modified loan. This presents a question of fact that cannot be properly resolved at this stage.

Defendants misconstrue how the updated property value is used in the modification process. There are requirements a lender must meet before it can <u>offer</u> a loan modification under HAMP. Those are different from the "terms and conditions" that a lender and borrower agree to in making the loan modification. Thus, while a lender is required to obtain an updated property value to determine a borrower's eligibility for a modification, it does not mean that the updated value becomes a "term and condition" of the modified loan. The updated property value only becomes a "term or condition" if the parties agree to it.

Defendants' reliance on the Fannie Mae Servicing Guides ("Fannie Mae Guides")[5] is also unavailing. Even if the Court were to consider the guidelines of a quasi-governmental agency at this stage, the HPA expressly provides that its provisions "shall supersede any conflicting provision contained in any agreement relating to the servicing of a residential mortgage loan entered into by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any private investor or note holder (or any successor thereto)." 12 U.S.C. § 4908(b). Here, the Fannie Mae Guides conflict with the HPA insofar as they specifically require use of "the property value at the time of the mortgage loan modification" to calculate PMI termination. <u>See</u> Fannie Mae Servicing Guide B-8.1-04, available at https://www.fanniemae.com/content/guide/svc121615.pdf. As discussed <u>supra</u>, an updated property value is not necessarily a "term and condition" of a modified loan under the HPA. These guidelines are therefore inapplicable to the present motion.[6]

---

[5] The Fannie Mae Servicing Guides are directives to third-party servicers on how to service a Fannie Mae loan. <u>See</u> Fannie Mae Servicing Guide, available at https://www.fanniemae.com/content/guide/svc121615.pdf.

[6] A bulletin recently issued by the Consumer Financial Protection Bureau ("CFPB") supports this position. <u>See</u> CFPB Bulletin 2015-03, Compliance Bulletin: Private Mortgage Insurance Cancellation and Termination, at *5 (August 4, 2015), available at http://files.consumerfinance.gov/f/201508_cfpb_compliance-bulletin-private-mortgage-

Accordingly, based on the plain, unambiguous language of the HPA, the Court finds that the updated property value is not always a "term and condition" of a modified loan. Here, Plaintiffs have sufficiently alleged that Defendants miscalculated the termination date because they never agreed that the updated property value was a "term and condition" of the modification. Plaintiff has adequately stated a claim for violation of the HPA.

### b.  HPA'S STATUTE OF LIMITATIONS

Defendants also claim that Plaintiff's HPA claim is time-barred. HPA claims must be brought within "2 years after the date of discovery of the violation that is the subject of the action." 12 U.S.C. § 4907(b). Defendants contend that the statute of limitations began to run in 2012 because Plaintiff purportedly discovered Chase's violation when she received a letter indicating that her PMI "was scheduled to automatically cancel on November 1, 2026." Compl. ¶¶ 71-72. However, Plaintiff sent numerous letters to Chase in response trying to determine how they calculated the termination date. Plaintiff was not aware that Chase was utilizing the BPO from the loan modification to calculate the termination date until October 2, 2013. The discovery rule provides that a claim "accrue[s] when the litigant first knows or with due diligence should know facts that will form the basis for an action." Merck & Co. v. Reynolds, 559 U.S. 633, 646 (2010). The Court finds that, until Plaintiff received this information in October 2013, she did not know the facts that formed the basis for her action and could not have discovered Chase's alleged HPA violation. Defendants' disclosures prior to October 4, 2013 were insufficient to put Plaintiff on notice of the violation. Therefore, the statute of limitations period on Plaintiff's claims did not begin to run until October 4, 2013, and Plaintiff's HPA claim is not time-barred.

---

insurance-cancellation-and-termination.pdf (explaining that "investor guidelines [such as Fannie Mae Guides] cannot restrict the PMI cancellation and termination rights that the HPA provides to borrowers" and to the extent those guidelines conflict with the HPA they are superseded).

### c. PREEMPTION PURSUANT TO THE HPA

Defendants contend that Plaintiff's state-law claims—breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, negligent misrepresentation, NJCFA, and TCCWNA—are expressly preempted by the HPA's preemption provision. The Court agrees.

Preemption is based on Congress's power to "take unto itself all regulatory authority over [a given topic]." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947); see McCulloch v. Maryland, 17 U.S. 316, 405-06 (1819). Preemption may be express or implied. Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152-53 (1982).

Section 4908 of the HPA sets forth the parameters of the Act's preemption power:

> With respect to any residential mortgage or residential mortgage transaction consummated after [July 29, 1999] and except as provided in paragraph (2) [concerning protected state laws], the provisions of this chapter shall supersede <u>any</u> provisions of the law of any State <u>relating to requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions</u>, cancellation or <u>automatic termination of such private mortgage insurance</u>, any disclosure of information addressed by this chapter, and any other matter specifically addressed by this chapter.

Id. § 4908(a)(1) (emphasis added). Exempted from preemption are so-called "protected State laws," except to the extent that such laws are inconsistent with any provision of the HPA. Id. § 4908(a)(2). Paragraph (2) of the provision describes "protected State law[s]" that the HPA does not preempt. Id. § 4908(a)(2).

Congress's use of the phrase "relating to" in the HPA "signals its expansive intent." See Gul v. Attorney Gen. of U.S., 385 F. App'x 241, 243 (3d Cir. 2010) (quoting Mizrahi v. Gonzales, 492 F.3d 156, 159 (2d Cir. 2007)). Other federal courts have construed the words "relating to" in preemption provisions of other federal statutes, most notably the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1144(a). "[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute

10

indicates, as a general matter, the intent to incorporate its judicial interpretations as well." Rowe v N.H. Motor Transp. Ass'n, 552 U.S. 364, 370 (2008) (internal citation omitted).

Relying on ERISA case law, several district courts have held that "it is clear that the preemptive reach of the HPA is expansive" and that "the HPA preempts all state laws that have 'a connection with' or 'reference to requirements for, inter alia, cancellation of PMI and disclosure of information concerning PMI cancellation." Fellows v. CitiMortgage, Inc., 710 F. Supp. 2d 385, 401 (S.D.N.Y. 2010). These courts have dismissed, as preempted, state-law tort and quasi-contract claims, and claims arising under state consumer protection statutes. See, e.g., Gregor v. Aurora Bank FSB, 26 F. Supp. 3d 146, 154 (D.R.I. 2014) (tort and unjust enrichment claims preempted); Augustson v. Bank of Am., N.A., 864 F. Supp. 2d 422, 437-38 (E.D.N.C. 2012) (fraud, negligent misrepresentation, and unjust enrichment claims preempted); Fellows, 710 F. Supp. 2d at 402 (New York deceptive trade practices act claim preempted). The Court finds the reasoning in Fellows, Augustson, and Gregor to be persuasive.[7]

Like in Fellows, Augustson, and Gregor, the Court concludes that the HPA's preemptive scope is analogous to ERISA. Here, each of Plaintiff's state-law claims is premised on Chase's alleged miscalculation of the automatic termination of PMI.[8] Each of Plaintiff's state-law claims

---

[7] Only two other courts have examined preemption under the HPA and held that state-law claims were not preempted. See, e.g., Scott v. GMAC Mortg., No. 10-24, 2010 U.S. Dist. LEXIS 88113 (W.D. Va. Aug. 25, 2010); Dwoskin v. Bank of Am., 850 F. Supp. 2d 557, 568-69 (D. Md. 2012). These cases are distinguishable. For example, in Scott, the Court held that the state-law fraud claims were not preempted because they were "altogether distinct and beyond the objectives of the HPA" and because the HPA would depend on different evidence than the fraud claim. 2010 U.S. Dist. LEXIS 88113, at *4-5; see also Dwoskin, 850 F. Supp. 2d at 568-69 (holding fraud and state law consumer protection claims not preempted for similar reasons as Scott Court). This is not the case here, as the claims stem from the same actions and would rely on the same exact evidence.

[8] See, e.g., Compl., Count II (discussing how Defendant disregarded the original value in calculating the termination date and therefore breached the contract); Count III (discussing how "as a result of the conduct alleged herein" Chase breached their implied covenant of good faith and fair dealing); Count IV (discussing how Defendants have been unjustly enriched in retaining

11

has a "connection with" the HPA's requirements for automatic termination of PMI. The conduct alleged in each state-law claim is the same conduct underlying the HPA claim. Thus, "the state-law claims, if permitted to go forward, would function as an alternate enforcement mechanism, echoing the enforcement provisions of the HPA, and frustrating Congress' objective of a uniform regulatory scheme." Gregor, 26 F. Supp. 3d at 154. All of Plaintiff's state-law claims are therefore preempted by the HPA.

IV. **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is **DENIED in part** and **GRANTED in part.** Plaintiff's HPA claim shall go forward. The remaining state-law claims are dismissed with prejudice as preempted by the HPA. An appropriate order accompanies this opinion.

**Dated: January 28, 2016**

/s Madeline Cox Arleo
**HON. MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

---

revenues from PMI payments past the true termination date); Count V (discussing how Defendants misrepresented how it calculated the termination date); Count VI (discussing how Defendants misrepresented and miscalculated the termination date); and Count VII (discussing how Defendant mispresenting that they used the original value to calculate the termination date).

12